48 N.W.2d 26 (1951)
Application of HVIDSTEN.
NORTHERN PACIFIC RY. CO.
v.
CART et al.
No. 7238.
Supreme Court of North Dakota.
May 9, 1951.
*27 Franklin J. Van Osdel, Fargo, for appellant Carl M. Hvidsten.
*28 Richard P. Gallagher, Commerce Counsel, Bismarck, for appellant Public Service Commission.
Conmy & Conmy, Fargo, for respondents.
MORRIS, Chief Justice.
This is an appeal from a judgment of the District Court of Cass County reversing and setting aside an order of the Public Service Commission granting a special certificate of public convenience and necessity to Carl M. Hvidsten for the hauling of petroleum products. Hvidsten, who will be referred to as the applicant, sought a special certificate as a common carrier under the provisions of Section 49-1810, 1949 Supp. to RCND 1943 to furnish transportation of petroleum products in bulk in tank trucks to points and places within the State of North Dakota from Fargo and Grand Forks, North Dakota, and points within ten miles of each to all points in North Dakota and return. Prior to the hearing, the applicant had been granted permission by the Interstate Commerce Commission to transport petroleum products by tank trucks to a described area in eastern North Dakota from Minneapolis, Minnesota and Superior, Wisconsin.
On December 14, 1946, the Public Service Commission issued an order which was amended on December 28, 1946, granting the applicant a special certificate of public convenience and necessity authorizing him to transport petroleum products in bulk from the pipe line terminals at Fargo and Grand Forks and immediate vicinities "to points and places in the State of North Dakota and return." The Northern Pacific Railway Company, the Great Northern Railway Company, the Minneapolis, St. Paul and Sault Ste. Marie Railroad Company, and the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, referred to as the respondents, appealed to the District Court of Cass County from the decision of the Public Service Commission. The district court reversed the decision of the commission in a judgment entered on June 12, 1947. The Public Service Commission and the applicant appealed from that judgment to the supreme court. The opinion upon that appeal, Hvidsten v. Northern Pacific Railway Company, N.D., 33 N.W.2d 615, pointed out that the commission had failed to make findings as provided by Section 28-3213, RCND 1943 and remanded the case to the district court with directions to return it to the Public Service Commission for further proceedings conformable to law. When the record was returned to the commission no new evidence was taken but the record was again reviewed by the commission and on September 29, 1948, new findings of fact, conclusions of law and order were made directing that a special certificate be issued to the applicant authorizing the transportation of petroleum products by motor truck in bulk tanks "from the terminal outlets of the Great Lakes Pipeline Terminal Company at or near Fargo and Grand Forks, North Dakota, and points within ten miles of said Cities, to points in North Dakota, and return; * * *"
The railroads appealed from the second order of the commission to the District Court of Cass County where the order was reversed and the case remanded with directions. From the judgment of the district court the commission and the applicant appeal to this court.
The trial court, in the judgment appealed from, determined that the commission was in error in making its findings of fact numbers VI to X inclusive, and XII, as they are not supported by the evidence and not in accordance with law, and in granting the applicant a special certificate authorizing him to transport petroleum products in bulk from the outlets of the Great Lakes Pipeline Terminal near Fargo and Grand Forks to points and places in the State of North Dakota and return. The court also determined that the special certificate should have limited the applicant's transportation service to bulk and service stations in villages and towns not served by rail carriers, and to bulk and service stations located outside of the corporate limits of villages, towns, and cities in this state, and the commission was directed to annul its former order and issue an amended order and certificate limited as above outlined.
In appeals to the district court under the Administrative Agencies, Uniform Practice *29 Act, Chapter 28-32, RCND 1943, the court shall try and hear the appeal without a jury upon the record filed with the court and "After such hearing, the court shall affirm the decision of the agency unless it shall find that such decision or determination is not in accordance with law, or that it is in violation of the constitutional rights of the appellant, or that any of the provisions of this chapter have not been complied with in the proceedings before the agency, or that the rules or procedure of the agency have not afforded the appellant a fair hearing, or that the findings of fact made by the agency are not supported by the evidence, or that the conclusions and decision of the agency are not supported by its findings of fact." Section 28-3219, RCND 1943.
The trial court determined that certain findings of fact of the commission are not supported by the evidence and not in accordance with the law. The issue in this appeal, therefore, arises upon those findings of the commission that the court rejected. These findings are as follows:
"6. That there are numerous points throughout the state where bulk oil stations can only be served by over-the-road tank trucks where service by rail is not available or where the large quantities of gasoline and oil in railroad tank cars can not be handled by the local distributor as where split loads of two thousand gallons or less are necessary;
"7. That service by rail is not flexible for the reason that ordinarily large quantities of 8,000 gallons or more are transported by railroad tank cars with the result that only such distributors as have adequate storage facilities located on the railroad right-of-way can be conveniently served. Transportation of gasoline and other petroleum products by motor tank trucks is therefore necessary to supplement transportation by rail. That there is a scarcity of railroad tank cars which are compartmented to hold 2,000 gallons or less. And, as mentioned above, many local distributors cannot be reached by rails and many such distributors are located in towns not served by railroads.
"8. That about 85 per cent of all petroleum products used in North Dakota is sold locally to farmers who carry on their farm operations with motorized equipment. Their requirements must be promptly met. Consumption of gasoline and other petroleum fuels is not only seasonal but is highly dependent upon the weather. When rains make the fields too wet, consumption drops. And since the weather is unpredictable dealers find it difficult to estimate demand and are often caught with empty tanks and therefore unable to supply their customers. Expedited service by motor carrier is therefore essential. In such contingencies the closer intra state service offered by common carrier tank trucks out of the pipe-line terminals at Fargo and Grand Forks is necessary and convenient;
"9. That there are three general advantages of truck transportation, namely: 1. Speed and flexibility, since it takes from one to three days to get delivery of a tank of petroleum products by rail as against two to twelve hours by motor truck; 2. Transport trucks are able to deliver small quantities of slow moving petroleum products, and; 3. Due to the fact that motor transports can handle small quantities when needed, pipe-line outlets are able to handle a more diversified line of petroleum products.
"10. If common carrier motor transportation is not made available, Oil Companies, such as Skelly, Texaco, Deep Rock and others, will transport gasoline to their jobbers in their own trucks. This is indicated by the testimony of Lloyd Hartvig, Division Manager of the Skelly Oil Company. He said: `We don't think it would be good business on our part if we didn't avail ourselves of the advantages of truck transportation. Because of this we intend to use truck transportation that is dependable and reliable and if transports are not available to us we will use our own trucks. At the present time we own approximately 30.'
"12. That This Commission finds as a fact: 1. That public convenience and necessity require the service proposed by applicant; 2. That the proposed truck service will not increase the cost of maintaining the public highways over which the applicant will operate since it will replace privately operated tank trucks; 3. That *30 applicants proposed service will not have a detrimental effect on other forms of existing transportation, and; 4. That the service now rendered, or which can be rendered, by existing transportation facilities, including the facilities of the various railroads, is not adequate to meet existing and future needs of the public."
At the time of the hearing before the commission the applicant had six years' experience in transporting petroleum products, was financially responsible, and had the equipment needed to perform to some extent the services authorized, including eight transportation units in which are compartments running from 500 to 2000 gallons capacity. The witnesses who testified in behalf of the applicant may be divided into several groups, the first being representatives of companies producing or distributing petroleum products to customers in North Dakota. Most of this distribution goes to bulk plants that in turn sell to consumers. Illustrative of this group of witnesses is R. Metivier who had general supervision of traffic and transportation matters for the Phillips Petroleum Company. He says that his company is one of the eight proprietary companies of the Great Lakes Pipeline Company which owns and operates the pipe line terminating at Grand Forks and Fargo. In distributing its products from the pipe line terminals, the Phillips Petroleum Company would use both rail and truck transportation. His company would use the services of the applicant if the desired certificate is granted. In the opinion of this witness, based upon past experience with rail and truck service, rail service alone out of Fargo and Grand Forks would not be reasonably adequate. The Phillips Petroleum Company has about 50 bulk outlets in North Dakota which are privately owned. The witness named three advantages of truck over rail transportation, which he stated to be as follows: "First the flexibility and speed of transport delivery; it takes from one to three days to get delivery on a tank car of petroleum products as against two to twelve hours by motor truck. Second, transport trucks are able to deliver small amounts of slow moving petroleum products. Third, our outlets are able to handle a more diversified line of petroleum products due to the fact that transports can handle in small quantities." The testimony of this witness is in general supported by representatives of the other producing and distributing companies.
The manager of the H. K. Stahl Company of St. Paul in charge of sales for distribution of tank cars and transports testified at some length regarding the company's problem of distribution of wholesale greases, oils, gasoline and fuels through the use of tank cars and truck transport. He proposed to render service by tank car and transport truck to between 40 and 50 customers in North Dakota, 20 of which are named and include such widely separated points as Wahpeton, Pembina, Devils Lake, Minot, Hettinger, and Glen Ullin. This witness emphasized the necessity for dealers to receive small compartment loads under the modern method of merchandising petroleum products and the diversified types of those products now being marketed by oil jobbers throughout the territory. He testified positively that rail service was not adequate.
The next group consists of two witnesses, each representing a large trucking concern operating as a common carrier of freight. At present they either buy from a private carrier or haul their needed petroleum products with their own equipment. They desire and would use the applicant's service.
The manager of a company that sells and delivers gasoline to Northwest Airlines testified that the airlines had tanks at Fargo and Grand Forks. The supplying company ships aviation gasoline to Fargo in tank cars which is unloaded into bulk storage tanks, and from there it is trucked to the tanks of the Northwest Airlines at Fargo and Grand Forks. The witness stated that the service of the applicant was necessary to the business in which he was engaged.
Six bulk station operators or managers testified for the applicant. In general they state that truck service is speedier than railway service and permits them to adapt their business to fluctuations in demand due to *31 seasonal and weather conditions. They would use both rail and truck transport service. The transport service is also of assistance in handling slow moving petroleum products in small quantities.
The North Dakota manager for the M & H Gasoline Company testified that his company preferred truck service because it costs less and trucks can deliver direct to the stations and avoid hauling from the bulk plant to the station. His company operates both bulk and filling stations, and now does some of its own trucking but would much prefer to use a common carrier.
Several of applicant's witnesses emphasized the point that tank trucks are divided into smaller compartments than tank cars; that such trucks can deliver quantities of petroleum products as small as 500 gallons. The smallest compartments available in tank cars hold 1800 or 1900 gallons. Compartmented tank cars are scarce and delay in the shipment of small quantities results. This situation creates a hardship on bulk stations with small storage capacity and those desiring to handle slow moving products.
The railroads produced the testimony of twelve bulk station operators who testified that rail service was satisfactory and adequate and that it gave more dependable year-round service.
Section 49-1814, RCND 1943 requires that before granting a certificate to a common motor carrier, the commission shall take into consideration four factors1, existing travel upon the route of the carrier; 2, the increased cost of maintaining the highway concerned; 3, the effect on other essential forms of transportation; 4, existing transportation facilities in the territory for which a certificate is sought. The same section further provides that: "In case it appears from the evidence that the service furnished or that could be furnished by existing transportation facilities is reasonably adequate, the commission shall not grant such certificate." Upon the former appeal of this case, N.D., 33 N.W.2d 615, we directed that the case be returned to the Public Service Commission for explicit findings upon the matters required to be considered by the commission under Section 49-1814, RCND 1943. These findings have now been made, and they, together with the evidence that was before the commission, are now before us on this appeal.
The railroads challenge the sufficiency of the evidence to support the findings of the commission upon the ground, among others, that the showing made by the applicant establishes that the service which he proposes to render is for the convenience of the supplying oil companies and their bulk station operators, rather than the convenience of the public. The bulk station operators and others who said they needed and would use the applicant's transport service are a part of the public and their business is such that they in turn serve the public generally. The bulk station operators stress the fact that the demand for their major products fluctuates greatly with the season and with the weather. This is due to the fact that much of the demand for motor fuel comes from agricultural operations in which the internal combustion engine plays an increasingly important part as a source of power. This situation has created a demand for speedy and flexible transport of motor fuel.
The railroads argue that the bulk station operators could render better service to their customers if they would install larger tanks and maintain on hand larger quantities. That argument in itself to some extent admits that the present system of delivery of petroleum products to the consumer is not wholly adequate. The railroads would increase the capacity of the bulk stations while the station operators would prefer more rapid delivery in smaller quantities than that furnished through railroad tank cars.
The railroads also point out that this application covers the entire state, except the cities of Fargo and Grand Forks and points within ten miles of each, as the territory or zone to which the applicant seeks the right to operate his transport service, and argue that the evidence does not sufficiently support the need for plaintiff's service throughout the territory, and that only a relatively small number of *32 points or towns are dealt with in the evidence. This is the most serious question in the case. This court has held that public convenience and necessity do not require additional transportation service to a territory that already has reasonably adequate service, or where the proposed service will create ruinous competition or materially impair the existing service to any part of the territory. Application of Midwest Motor Express, 74 N.D. 416, 23 N.W.2d 49; Tri-City Motor Transportation Co. v. Great Northern Ry. Co., 67 N.D. 119, 270 N.W. 100. On the other hand, our statutes do not contemplate protecting the railroads from all competition. A significant amendment was made by the legislature in 1945, to the law prescribing duties of the Public Service Commission. Section 49-1808, RCND 1943 charged the Publice Service Commission with the supervision and regulation of common motor carriers and paragraphs four and five directed that it should:
"4. Prevent substantial duplication of service between common motor carriers and between them and the lines of competing railroads;
"5. Not substitute substantially the operation of motor common carriers for existing railroad transportation facilities and may require the coordination of the service and schedules of competing carriers by motor vehicle;".
These two paragraphs were amended by Chapter 272, SLND 1945, Section 49-1808, 1949 Supp. to RCND 1943, to read:
"4. Prevent unfair competition between common motor carriers and between them and the lines of competing railroads.
"5. Prevent unjust discrimination or preferences between common motor carriers and between them and competing railroads, and may require the coordination of motor service and schedules of such carriers with rail service."
The amendment of Section 49-1808, RCND 1943 wrought by Chapter 272, SLND 1945, Section 49-1808, 1949 Supp. to RCND 1943, indicates an intention on the part of the legislature to relax restrictions against competitive motor carrier transportation service, but does not mean that the Public Service Commission may permit motor carriers to enter into unrestricted competition with existing transportation facilities. Swartwout v. Ditsworth, N.D., 48 N.W.2d 22. No amendment was made of Section 49-1814, RCND 1943 which prohibits the granting of a certificate "In case it appears from the evidence that the service furnished or that could be furnished by existing transportation facilities is reasonably adequate,".
The railroads argue that at the most the applicant is entitled to a certificate authorizing him to haul to specific points where necessity for transportation has been proved and where the evidence shows the present transportation to be inadequate. The application under consideration does not seek authority to transport to specific points, but for general authority to operate from or to a territory or zone under the provisions of Section 49-1810, 1949 Supp. to RCND 1943, which states: "Special common motor carriers may transport commodities within their authority in any quantity but only from or to that territory or zone which they heretofore lawfully served, proved or hereafter may prove, public convenience and necessity. A special common motor carrier shall have the authority: 1. To transport household goods, emigrant movables, livestock, and farm supplies or other special commodities or general commodities in truckloads as defined by the commission, from or to points not in such zone or between points on Class A routes, by the authority and under the conditions and rules set by the commission; 2. To specify minimum shipments which the carrier shall be obliged to carry, by tariff publication, subject to the approval of the commission." We do not believe that the legislature intended that before a certificate of convenience and necessity could be issued under this section the applicant must show that all factors entitling him to such a certificate must exist with respect to every point within the zone or territory. Neither did it intend that by showing that those factors did exist in but a few points in a large zone or territory the applicant could be granted permission to all points in that territory without regard to the general *33 prevalence of the required factors throughout the territory. Between these two extremes lies a mean of proof which would permit the Public Service Commission to exercise its judgment and discretion in granting or withholding a certificate. The Public Service Commission may issue a certificate of public convenience and necessity authorizing a special common carrier to operate in accordance with the provisions of Section 49-1810, 1949 Supp. to RCND 1943, if the proof shows that the service for which authority is sought will serve the need and convenience of the public generally throughout the territory, and favorable findings regarding the other factors required to be considered under the provisions of Section 49-1814, RCND 1943 are supported by substantial evidence, although it may appear that at some points in the territory the service already available is or might be made reasonably adequate. In re Theel Brothers Rapid Transit Co., 72 N.D. 280, 6 N.W.2d 560; Application of Dakota Transportation, 67 S.D. 221, 291 N.W. 589; Application of Megan, 69 S.D. 1, 5 N.W.2d 729; Utah Light & Traction Co. v. Public Service Commission, 101 Utah 99, 118 P.2d 683; State ex rel. Byram v. Department of Public Works of Washington, 144 Wash. 219, 257 P. 634; Hutchison v. Pennsylvania Public Utility Commission, 168 Pa. Super. 319, 77 A.2d 744.
The railroads also argue that at many points, particularly on branch lines, a large part of the railroad revenue is derived from the transportation of petroleum products and that the loss of a substantial portion of this revenue would result in material impairment of the present branch line service. It is a matter of general knowledge that for a number of years branch line railroads have suffered and will continue to suffer a loss of business due to the competition of motor transportation, both public and private. The granting of applicant's certificate and other similar certificates will no doubt result in the loss of some further railroad revenue, but to what extent we are unable to determine from this record. A portion of applicant's business will be the replacement of service now rendered by private motor carrier as disclosed by the evidence that we have already discussed and will not result in a decrease in the volume of railroad business. Most of applicant's witnesses testify that they will use both railroad and truck transportation if both are available. This is the testimony of both the suppliers and the bulk station operators. The commission took the view that the granting of the application would not be detrimental to the service rendered by the railroads.
The railroads also contend that the operation of applicant's service will materially increase the cost of maintaining the highways of the state. To the extent that it will supplant service by rail, that is true. For the privilege of using the highways the applicant will pay license fees and motor fuel taxes. The record does not disclose that the revenue thus collected by the state will be disproportionate to the additional cost of maintaining the highways due to applicant's use.
After review of the entire record in the light of the statutes applicable thereto, we reach the conclusion that the findings of fact of the Public Service Commission are supported by the evidence and that its conclusions and decision are supported by its findings of fact and are in accordance with law. The judgment of the district court is reversed and the case is remanded to that court for further proceedings consistent with this opinion.
BURKE, SATHRE, CHRISTIANSON and GRIMSON, JJ., concur.