In the Matter of the Appeal of DICKIN-
SON NURSING CENTER.

DICKINSON NURSING CENTER,
Appellant,

v.

NORTH DAKOTA DEPARTMENT OF
HUMAN SERVICES, Appellee.

Civ. No. 10564.

Supreme Court of North Dakota.

June 28, 1984.

Patric Hooper of Weissburg & Aronson, Los Angeles, Cal., and Albert J. Hardy of Howe, Hardy, Galloway & Maus, Dickinson, for appellant.

Blaine L. Nordwall, Asst. Atty. Gen., North Dakota Dept. of Human Services, Bismarck, for appellee.

VANDE WALLE, Justice.

Dickinson Nursing Center [DNC] has appealed from a district court judgment affirming a decision of the North Dakota Department of Human Services [Department] which excluded certain depreciation and interest costs from DNC's Medical Assistance Program [Medicaid] payment rate. The Department has moved to dismiss DNC's appeal alleging lack of compliance with Rule 30(a) and (b), N.D.R.App.P. We deny the Department's motion to dismiss the appeal and affirm the judgment of the district court.

The material facts are not disputed. On December 31, 1974, Werner G. Nistler, Jr., Emerson J. Collier, Ronald V. Roderick, James L. Meier, and John R. Jacob formed a limited partnership under Oregon law to own and operate DNC, a 185-bed nursing facility in Dickinson which, at all times relevant to this appeal, has been a participant in the Medicaid Program. The limited partnership was later changed to a general partnership and Nistler and Collier each owned 30 percent of the partnership interests.

During 1979 and 1980, Nistler and Collier purchased the partnership interests of the other partners through a series of three separate transactions. After the final "buy-out," Nistler and Collier each owned 50 percent of the partnership interests. Nistler and Collier then entered into a new partnership agreement to own and operate DNC. The agreement was designated to "supersede" the previous partnership agreement and the agreement directed that upon its execution the partners file with the Oregon Corporation Commissioner notice of termination and dissolution of the previous partnership agreement.

In reporting their direct and indirect costs to the Department, Nistler and Collier claimed an increased depreciation cost of $25,730 and an interest expense of $59,345, which reflect the price paid by Nistler and Collier to acquire the other partners' 40 percent interests in DNC's assets. The Department audited these costs in 1981 and determined that the increased depreciation and interest expenses should not be included in DNC's Medicaid payment rate.

DNC requested and received an administrative hearing to contest the decision, and

the Department ultimately upheld the initial audit disallowances. DNC appealed to the district court, which affirmed the Department's decision. DNC now appeals from the district court's judgment.

## MOTION TO DISMISS

The Department has moved this court to dismiss the appeal, alleging that DNC failed to comply with the provisions of Rule 30(a) and (b), N.D.R.App.P. The Department contends that Rule 30(a) was violated because the appendix submitted by DNC does not contain certain docket entries which the Department considers relevant. Instead, many of the items have been included in a separate document entitled "Excerpts from the Administrative Record." The Department has also submitted a separate appendix. The Department further asserts that Rule 30(b) was violated because DNC did not serve a designation of the parts of the record intended to be included in the appendix or a statement of the issues to be presented.

■ Failure to comply with the Rules of Appellate Procedure may be, in the discretion of this court, a ground for dismissal of an appeal. Rules 3(a) and 13, N.D.R. App.P.; *Matter of Estate of Raketti*, 340 N.W.2d 894 (N.D.1983). However, such a severe sanction is to be applied sparingly, and we have often indicated our preference to reach the merits of cases when the record and briefs on the merits have been filed and the case is ready to be heard. *Raketti, supra.*

■ Because this court now has before it three separate "appendix-like" documents to review, the Department asserts that it has been prejudiced by the resulting interference with its opportunity "to present its case to the court in a cohesive, concise, and consistent manner—the effect of which cannot be objectively measured."

The circumstances in this case do not warrant dismissal of the appeal. The De-

partment's claim that prejudice is inherent in any disruption of the appellate review process is not sufficient to demonstrate actual prejudice. Assessment of costs against the noncomplying party is a more appropriate sanction in the context of the present case. See *Raketti, supra.* We therefore assess costs in the amount of $250 against DNC to compensate the Department for costs incurred in preparing a separate appendix.

## MERITS

### I. General Medicaid Reimbursement Principles

Because this case involves a rather unique area of the law, a brief overview of the relevant Medicaid reimbursement principles is helpful to understand the basis for the dispute in this action.

The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.,* provides for a system of medical care services for the poor which is subsidized by both State and Federal funds. Medicaid is administered at the Federal level by the Department of Health and Human Services through the Health Care Financing Administration, and at the State level by the Department. The furnishing of medical services under the Medicaid Program is accomplished by a direct payment from the Department to health-care facilities which act as "providers" of services to eligible recipients. Providers of long-term care, such as DNC, are reimbursed for services rendered to Medicaid patients in accordance with Chapter 75–02–06, N.D.A.C.,[1] promulgated by the Department under the authority granted by § 50–24.1–04, N.D.C.C.

State agencies administering Medicaid "may not pay more in the aggregate for ... long-term care facility services than the amount that would be paid for services under the Medicare principles of reimburse-

---

1. Chapter 75–02–06, N.D.A.C., was amended effective December 1, 1983. Our citations to this chapter of the Administrative Code are to the provisions as they existed at the time this dispute arose, which was prior to the latest series of amendments.

ment ..." [42 C.F.R. § 447.272(a) (1983) ].[2] Thus the Department's payment-rate regulations are closely patterned after the corresponding principles governing reimbursement for long-term-care services rendered under Medicare, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, which provides for a system of federally subsidized health care services for the aged and disabled. The corresponding Medicare regulations are found at 42 C.F.R. § 405.-401 *et seq.*

Medicaid providers are reimbursed for the "reasonable cost" of providing health-care services to eligible recipients. See § 75–02–06–01(17), N.D.A.C. Among the "reasonable costs" reimbursable to long-term-care facilities are depreciation allowances for a health-care facility's buildings and equipment [§ 75–02–06–03, N.D.A.C.], and interest expenses on funds borrowed for the acquisition, operation, or maintenance of facilities and equipment [§ 75–02–06–04, N.D.A.C.].[3]

Generally, a provider claiming a depreciation allowance is not limited to the original cost basis of the facility's assets, but is allowed depreciation based on the "historical costs" of the assets. Historical costs are defined as "those costs which are incurred by the present owner in acquiring and preparing the asset for use." § 75–02–06–03(5)(a), N.D.A.C. However, if the purchaser acquires the assets in a sale that is not bona fide, the purchaser is limited to the seller's cost basis. § 75–02–06–03(5)(c), N.D.A.C. Corresponding limits are also imposed on reimbursement for interest paid in connection with the acquisition of a provider's assets. See § 75–02–06–04, N.D.A.C.; see also 42 C.F.R. § 405.419(d) (1983).

Section 75–02–06–07(1), N.D.A.C., consistent with 42 C.F.R. § 405.427 (1983), provides in pertinent part:

"75–02–06–07. RELATED ORGANIZATION.

"1. Costs applicable to services, facilities, and supplies furnished to a provider by organizations related to the provider by common ownership or control shall not exceed the lower of the cost to the related organization or the price of comparable services, facilities, or supplies purchased elsewhere primarily in the local market...."

The Department determined that § 75–02–06–07(1), N.D.A.C., applied in this case to limit DNC's depreciation costs and interest expenses to no more than the cost to the seller, thereby effectively disallowing DNC's claims relating to the acquisition of the facility by Nistler and Collier.

II. Standard of Review

 Our review of an administrative agency decision involves a three-step process whereby we determine whether or not the findings of fact are supported by a preponderance of the evidence, the conclusions of law are sustained by the findings of fact, and the decision is supported by the conclusions of law. § 28–32–19, N.D.C.C.; *Grant Farmers Mutual v. State By Conrad,* 347 N.W.2d 324 (N.D.1984). We do not make independent findings of fact or substitute our judgment for that of the agency, but determine only whether or not a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record. *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214 (N.D. 1979). In making this determination, we look to the record compiled before the administrative agency rather than to the findings of the district court. *Asbridge v. North Dakota State Highway Com'r,* 291 N.W.2d 739 (N.D.1980).

 Administrative agency decisions on questions of law are fully reviewable by

---

**2.** This provision was removed from the Federal regulations effective January 18, 1984. The substantive equivalent of 42 C.F.R. § 447.272(a) is currently found at 48 Fed.Reg. 56,057 (1983) [to be codified at 42 C.F.R. § 447.253(b)(2) ].

**3.** Federal regulations relating to depreciation allowances and interest expenses are found at 42 C.F.R. §§ 405.415 and 405.419 (1983), respectively.

our court. *Grant Farmers Mutual, supra; State Hospital v. N.D. Employment Security Bureau,* 239 N.W.2d 819 (N.D. 1976). In the complex Medicare reimbursement field, however, Federal courts have recognized that the administrative agency has been granted broad discretion to develop the "reasonable cost" concept, and that its decisions in this area should be upheld if reasonably consistent with the statute. *Richey Manor, Inc. v. Schweiker,* 684 F.2d 130 (D.C.Cir.1982); *Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201 (5th Cir.1980).

### III. Related Organization Rule

The Department applied the related organization rule, § 75–02–06–07(1), N.D. A.C., and disallowed DNC's claim for increased depreciation and interest costs. "Related organization" is defined in § 75–02–06–01(18), N.D.A.C.:

"18. 'Related organization' means an organization with which a provider is to a significant extent associated or affiliated with or has control of, or is controlled by the organization furnishing the services, facilities, or supplies. Control may be obtained either through ownership, management, or contractual arrangements."

Federal cases that have analyzed the similar Federal Medicare reimbursement system have described the related organization rule [42 C.F.R. § 405.427] as a prophylactic measure which defines any charges in excess of actual cost as per se unreasonable. *Goleta Valley Community Hospital v. Schweiker,* 647 F.2d 894 (9th Cir.1981); *Marina Mercy Hospital v. Harris,* 633 F.2d 1301 (9th Cir.1980); see also *Trull Nursing Home v. St. Dept. of Human Services,* 461 A.2d 490 (Me.1983) [application of rule in Medicaid context]. Once relatedness is found, acquisition costs are categorically disallowed regardless of the fairness of the particular transaction. *Rio Hondo Memorial Hospital v. U.S.,* 689 F.2d 1025 (Ct.Cl.1982); *Goleta Valley Community Hospital, supra;* see also *Trull Nursing Home, supra.* The rule is intended to prohibit "sweetheart contracts"

and serves the dual goals of helping agency administrators avoid paying collusive or improperly increased costs, and of reducing the administrative burden. *Jackson Park Hospital Foundation v. United States,* 228 Ct.Cl. 448, 659 F.2d 132 (1981); *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123 (9th Cir.1980); *Medical Center of Independence v. Harris,* 628 F.2d 1113 (8th Cir.1980).

The rationale for this rule was expressed by the court in *Stevens Park Osteopathic Hospital, Inc. v. U.S.,* 225 Ct.Cl. 113, 633 F.2d 1373, 1379 (1980):

"This regulation, like other 'related organization' rules, is intended to have a 'prophylactic' effect in guarding against bad faith dealing between organizations related through common control without inquiry into particular circumstances.... [The regulation] specifically recognizes that related organizations should be treated as a single entity for purposes of determining reasonable costs because the provider is, in effect, obtaining the facilities from itself. It is evident that inquiry into the fairness of transactions between related parties would be a demanding task indeed for the fiscal intermediary, while inquiry into the usually simpler issue of common control probably would have to take place anyway." [Citations omitted.]

### IV. Application of Law to the Facts

▮ Relying on several Federal court and Federal administrative interpretations of the similar Medicare reimbursement principles, DNC asserts that the "buyouts" by Nistler and Collier of the other partners' interests, followed by the dissolution of the former partnership and formation of a new partnership to own and operate the provider, is analogous to the "two-step" corporate provider takeovers in which an increase in historical costs and interest have been allowed.

Generally, the "two-step" acquisition of a Medicare provider referred to by DNC occurs in the following manner: The purchaser acquires 100 percent of the stock, i.e.,

ownership interests, of an unrelated corporate provider with the intention of dissolving the corporation. At a later date, the new "subsidiary" is merged into the purchaser, i.e., the assets are transferred. After these steps have been completed, the entire transaction is recognized as a sale of assets for Medicare reimbursement purposes, and the related organization rule of 42 C.F.R. § 405.427 will not be applied to the merger step of the transaction to deny the purchaser the benefit of reimbursement on a "step-up" in the basis of the acquired asset. See Annot., 63 A.L.R.Fed. 486 (1983); *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123 (9th Cir. 1980).

DNC likens Nistler and Collier's purchase of the other three partners' ownership interests in the original partnership to the acquisition of 100 percent of the stock of an unrelated corporate provider. The requisite second step occurred, according to DNC, when Nistler and Collier dissolved the original partnership and entered into a new partnership agreement to own and operate DNC. Assuming for the sake of argument that DNC's analogy between the ownership of partnership interests and assets and corporate stock and assets is valid, we nevertheless conclude that the cases relied on by DNC do not directly support the allowance of increased depreciation and interest costs under this set of circumstances.

An analysis of the decisions relied on by DNC reveals that in none of the cases did the owners of substantial interests in the acquired provider ultimately become the owners of 100 percent of the ownership interests in the "new" provider and successfully claim increased depreciation and

interest costs as a result of the acquisition.[4] See *Spokane Valley General Hosp., Inc. v. United States*, 688 F.2d 771 (Ct.Cl. 1982); *West Seattle General Hospital, Inc. v. United States*, 230 Ct.Cl. 132, 674 F.2d 899 (1982); *Monterey Life Systems v. United States*, 225 Ct.Cl. 50, 635 F.2d 821 (1980); *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123 (9th Cir.1980); *Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201 (5th Cir.1980); *Mesa General Hospital v. Blue Cross Assoc./Blue Cross/Blue Shield of Arizona*, PRRB Hearing Dec. No. 82–D19 (Dec. 9, 1981) Medicare and Medicaid Guide (CCH), ¶ 31,636 at 10,103 [1981 Transfer Binder], *aff'd*, Medicare and Medicaid Guide (CCH), ¶ 31,856 at 9280 [1982 Transfer Binder]. In other words, at the time the first step in the two-step transaction occurred, the buying and selling parties did not each have ownership interests in the legal entity which was the subject of the acquisition.

In this case, Nistler and Collier together controlled 60 percent of the ownership interests in the original partnership before the series of "buy-outs" began. Following their acquisition of the remaining partnership interests and the formation of the "new" partnership, Nistler and Collier controlled DNC in its entirety. We cannot say that the Department's application of §§ 75–02–06–01(18) and 75–02–06–07(1), N.D.A.C., to the facts of this case is erroneous.

■ DNC also argues that the related organization provisions were not intended to apply to the single sale of a facility, but apply only to on-going transactions where one party repeatedly supplies services, facilities, or supplies to the other. DNC relies on *South Boston General Hosp. v. Blue Cross of Va.*, 409 F.Supp. 1380 (W.D.

---

**4.** DNC relies on *Provider Appeal Decision* (Blue Cross Association), No. 00–77–24, Medicare and Medicaid Guide (CCH), ¶ 28,565 at 9970 [1977 Transfer Binder], an administrative decision in which it was determined that the related organization rule did not apply to a transaction in which one partner "bought out" the interests of the other two partners in a partnership. The agency ruled that the assets had to be revalued on the basis of their historical costs.

We do not find this administrative decision persuasive. The text of the decision is preceded by the following comment: *"Caution: BHI [Bureau of Health Insurance] states that 'this case should not be relied upon, used, or cited as precedent.'"* [Emphasis in original.] Furthermore, the facts differ from the present case because the provider in the administrative decision was claiming that the related organization rule applied to the acquisition in order to prevent a revaluation of assets.

Va.1976), as authority for this proposition. The *South Boston* decision, however, has not been followed by the vast majority of courts that have considered the question. See, e.g., *Shaker Medical Center Hosp. v. Secretary of Health*, 686 F.2d 1203 (6th Cir.1982); *Jackson Park Hospital Foundation v. United States*, 228 Ct.Cl. 448, 659 F.2d 132, 137 n. 12 (1981); *Goleta Valley Community Hospital v. Schweiker*, 647 F.2d 894 (9th Cir.1981); *American Hospital Management Corp. v. Harris*, 638 F.2d 1208, 1213 n. 9 (9th Cir.1981); *Stevens Park Osteopathic Hospital, Inc. v. U.S.*, 225 Ct.Cl. 113, 633 F.2d 1373 (1980); *Hillside Community Hospital of Ukiah v. Mathews*, 423 F.Supp. 1168 (N.D.Cal.1976); *Trull Nursing Home v. St. Dept. of Human Services, supra. But see Northwest Hospital, Inc. v. Hospital Service Corp.*, 687 F.2d 985 (7th Cir.1982). We likewise decline to follow *South Boston* and conclude that §§ 75–02–06–01(18) and 75–02–06–07(1), N.D.A.C., apply to a single sale of a health-care facility.

■ Finally, DNC asserts that the partnership interests were acquired as a result of bona fide bargaining, the amounts paid did not exceed the fair market value of the facility's assets, and the sums claimed relate only to the increase in cost basis for the 40 percent of the total provider assets which were acquired from the former partners. Because of these factors, DNC argues that we should refuse to apply the related organization rule to the instant acquisition. However, as we have already noted, the related organization rule is a prophylactic measure, and once relatedness is found, acquisition costs are disallowed regardless of the asserted fairness of the particular transaction.

We have reviewed the record in this case and conclude that the Department's findings of fact are supported by a preponderance of the evidence, the conclusions of law are sustained by the findings of fact, and the decision is supported by the conclusions of law.

The judgment is affirmed.

ERICKSTAD, C.J., and PEDERSON, GIERKE and SAND, JJ., concur.