MATADOR SERVICE, INC., Power Fuels, Inc., and Getter Trucking, Inc., Appellants,

v.

MISSOURI BASIN WELL SERVICE, INC., and Bruce Hagen, Leo M. Reinbold, Dale V. Sandstrom, members of the North Dakota Public Service Commission, Appellees.

Civ. No. 10762.

Supreme Court of North Dakota.

May 1, 1985.

Wheeler, Wolf, Peterson, Schmitz, Mc-
Donald & Johnson, Bismarck, for appel-
lants Matador Service, Inc. and Power Fu-
els, Inc.; argued by R.W. Wheeler, Bis-
marck.

McIntee & Whisenand, Williston, for ap-
pellant Getter Trucking, Inc.; argued by
Fred E. Whisenand, Williston.

Hovland & Gambucci, Minneapolis,
Minn., for appellee Missouri Basin Well
Service, Inc.; argued by James B. Hovland,
Minneapolis, Minn.

Daniel S. Kuntz, Asst. Atty. Gen., North
Dakota Public Service Com'n, Bismarck,
for Public Service Com'n.

ERICKSTAD, Chief Justice.

Matador Service, Inc. [Matador], Power
Fuels, Inc. [Power Fuels], and Getter
Trucking, Inc. [Getter] appeal from a dis-
trict court judgment affirming an order of
the North Dakota Public Service Commis-
sion [PSC] which granted a special certifi-
cate of public convenience and necessity to
Missouri Basin Well Service, Inc. [Basin].
We affirm.

During January 1980, Basin was incorpo-
rated for the purpose of providing comple-
tion, maintenance, and other services re-
quired in the production of oil, gas, and
related minerals. Between the spring of
1981 and October 1982, Basin purchased
four trucks and leased them at various
times to several oil field shippers and certi-
ficated common motor carriers operating in
western North Dakota.

Under the terms of the lease agree-
ments, the trucks were driven by Basin
employees and the drivers received their
direction and pay from Basin rather than
from the lessee. As rental for the use of
the truck and driver, the lessee paid a fuel
surcharge and an hourly rate five percent
less than the PSC published rate schedule.
Before entering into the leases, Basin con-
sulted with PSC motor carrier division per-
sonnel regarding equipment leases with
shippers and mailed a copy of the leases to
the PSC for its tacit approval.

In October 1982, Basin began leasing its
four trucks exclusively to Getter. The
truck leases with Getter were filed and
approved by the PSC pursuant to Chapter
69–03–06, N.D.A.C. Under the lease ar-
rangement, Basin paid Getter between 15
and 23 percent of all gross revenue. Dur-
ing the first five months of 1983, Basin lost
more than $13,000 in its trucking operation
while paying Getter more than $97,000.
Basin attempted to negotiate for a lower
percentage rate of payment to Getter, but
Getter refused to reduce the rate.

On April 29, 1983, Basin filed an applica-
tion with the PSC for a special certificate
of public convenience and necessity seeking
authority to transport:

"Liquids used in or in connection with
the discovery, development and produc-
tion of natural gas and petroleum and
their products and by-products, between
points in Golden Valley, Stark, Dunn,
Billings, Hettinger, Adams and Bowman
Counties, ND."

The application was subsequently amend-
ed to include Slope County and to contain a
restriction against the transportation of

crude oil and refined petroleum products, except under certain circumstances.

Matador, Power Fuels, and Getter appeared at the hearing to protest the application. The PSC issued its findings of fact, conclusions of law and order granting Basin's application on November 1, 1983. The district court affirmed the PSC's decision in a judgment dated May 29, 1984, and Getter, Matador, and Power Fuels have appealed.

## I

Getter asserts on appeal that the PSC's findings relating to the need for the proposed service, the public convenience and necessity, and the effect of the proposed service on other existing transportation facilities are not supported by a preponderance of the evidence.

 In an appeal from a decision of an administrative agency, we review the agency's decision rather than the district court's decision, and look to the record compiled by the agency. *Application of Skjonsby Truck Line, Inc.*, 357 N.W.2d 227 (N.D. 1984); *Garner Public School v. Golden Valley County Committee*, 334 N.W.2d 665 (N.D.1983). We determine whether or not the administrative agency's findings of fact are supported by a preponderance of the evidence, its conclusions of law are sustained by the findings of fact, and its decision is supported by the conclusions of law. *Application of Skjonsby Truck Line, Inc., supra; Appeal of Dickinson Nursing Center*, 353 N.W.2d 754 (N.D. 1984). We do not make independent factual findings or substitute our judgment for that of the agency, but determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record. *Application of Skjonsby Truck Line, Inc., supra; Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214 (N.D.1979).

The thrust of Getter's argument in regard to each of the issues it has raised is that the PSC's findings and conclusions are in error because they fail to recognize the legal effect of the lease agreements between Getter and Basin. The PSC's findings and conclusions are based on the testimony of several shipper witnesses who appeared in support of the application and testified, in essence, that they rely on Basin to satisfy their transportation requirements and that they wish to continue using Basin's services for future needs. Getter asserts that the services referred to by the shippers were not those of Basin, but were those of Getter under its lease agreements with Basin.

The PSC found that under the lease arrangement "Getter does not provide Missouri Basin with any direction as to the conduct of its operation." The PSC further found that when Basin entered into the lease agreements with Getter "it had some customers and it has been continuing to serve those customers," and that Getter has contacted Basin with offers of freight "less than 10 times." With regard to the lease arrangement, the PSC found:

"Missouri Basin furnishes the trucks, drivers, carries its own insurance, pays all of its equipment and operational expenses, solicits its own business, answers the phone at its terminal facility and dispatches equipment under the name Missouri Basin on a 24-hour per day basis. All billings are prepared by Applicant and processed for payment by Getter. Getter handles proration and licensing on Missouri Basin's equipment, pays Missouri Basin based on billings and allows Missouri Basin to operate under their authority."

The evidence reflects that most of the shippers served by Basin were solicited by Basin rather than Getter and considered Basin to be the carrier. The PSC's findings that shippers wanted to continue to use Basin as a carrier recognized the distinction between the service rendered by Basin as Getter's lessee and the services rendered by Getter with its own equipment and personnel. We conclude that the PSC did not err in characterizing Basin, throughout its findings and conclusions in this case, as the provider of services even

though the services were provided by lease under Getter's authority.

■ Getter asserts that Basin failed to establish a need for the proposed service. Getter argues that the PSC erred in not finding that the shipper witnesses had no complaints or problems in securing adequate services and that the existing certificated carriers had the necessary equipment and resources to provide the transportation services Basin sought to provide. Getter's argument implies that the PSC was required to make a finding regarding the adequacy of existing service. This court, rejecting a similar argument in *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 225–226 (N.D.1979), held that the evidence need not show that the services furnished by holders of existing certificates are not reasonably adequate before an additional certificate may be granted to an applicant. We quoted with approval from *In re Hanson*, 74 N.D. 224, 239, 21 N.W.2d 341, 349 (1945):

" '[T]he commission is not confined to the immediate present. It must have a broad view and a far look and though public necessity and convenience may seem to be somewhat trivial at first, to the commission charged with the duty of oversight it may appear conditions were so shaping themselves there is a growing demand now and for the immediate future and thus the commission be required to make provision therefor. It is not merely the necessity for the next day; but for the morrow which governs the commission.' " *Power Fuels, supra*, 283 N.W.2d at 225–226. [Footnote omitted.]

In 1981, the Legislature amended § 49–18–14, N.D.C.C.,[1] by specifically deleting

adequacy of existing transportation facilities as a factor to be considered by the PSC in granting a certificate. 1981 N.D.Sess. Laws Ch. 479, § 8. Getter's assertion is therefore without merit.

■ Many of the shipper witnesses testified that they are currently relying on Basin to satisfy their transportation needs, that they expect expansion of their North Dakota operations in the future, and that they wish to use Basin's services for those future needs. We conclude that the PSC's findings relating to the public need for Basin's services are supported by a preponderance of the evidence.

Getter also asserts that, before a certificate may be granted, the PSC must find that public convenience and necessity *require* the proposed service rather than that the proposed service would be consistent with public convenience and necessity. Getter relies on § 49–18–15, N.D.C.C., which provides in pertinent part:

"*49–18–15. Testimony—Issuance of certificate—Conditions*.... If the commission finds from the evidence that the public convenience and necessity require the proposed service or any part thereof, it may issue the certificate as prayed for, or may issue it for the partial exercise only of the privilege sought, and may attach to the exercise of the right granted by the certificate such terms and conditions as in its judgment the public convenience and necessity may require. Otherwise such certificate shall be denied."

Section 49–18–14, N.D.C.C., which is also relevant, provides in pertinent part:

1. Section 49–18–14, N.D.C.C., currently provides:

"*49–18–14. Factors to be considered by commission in granting certificate.* Before granting a certificate to a common motor carrier, the commission shall take into consideration:
1. The need for service proposed by the applicant;
2. The increased cost of maintaining the highway concerned;
3. The effect on other existing transportation facilities;

4. The fitness and ability of applicant to provide service;
5. Adequacy of proposed service; and
6. Such other information as the commission may deem appropriate.
"If the commission finds that the transportation to be authorized by the certificate is not consistent with the public convenience and necessity the commission shall not grant such certificate."

*"49–18–14. Factors to be considered by commission in granting certificate.*

\* \* \* \* \* \*

"If the commission finds that the transportation to be authorized by the certificate is not consistent with the public convenience and necessity the commission shall not grant such certificate."

■ The PSC asserts that § 49–18–15, N.D.C.C., merely empowers it with options in issuing an authority once it is determined that the proposed service should be authorized, and therefore it should not be interpreted as restricting the provisions of § 49–18–14, N.D.C.C. The PSC further contends that if there is an inconsistency between the two statutes, the inconsistency should be resolved in favor of § 49–18–14, N.D.C.C., because it is the more recently enacted provision and the more specific. *See* § 1–02–07, N.D.C.C.; *Kershaw v. Burleigh County,* 77 N.D. 932, 47 N.W.2d 132 (1951). We agree.

The legislative history of the 1981 amendments to § 49–18–14, N.D.C.C., supports the PSC's interpretation. *See* Minutes of the House Committee on Transportation, January 15, 1981 [H.B. 1138]. A spokesman for the PSC, the proponent of House Bill 1138, testified:

"Existing language also provides that if an existing carrier is or could provide a proposed service, an application for the proposed service must be denied. Under this standard the only practical manner in which a new carrier may obtain authority is if the service is simply not being provided or existing carriers cannot keep up with demand. This hinders the development of a healthy competitive atmosphere even where traffic is sufficient to sustain two or more carriers. *The proposed language establishs [sic] consistency with public convenience and necessity as the only standard under which an application will be granted."* Written Testimony on H.B. 1138 presented by Ray H. Walton, Commerce Counsel, North Dakota Public Service Commission, at p. 8. [Emphasis added.]

We conclude that the PSC need not find that public convenience and necessity require the proposed service as a prerequisite to the granting of a certificate, but need find only that the proposed service is consistent with public convenience and necessity.

■ Getter asserts that the PSC's determination that the granting of the certificate is consistent with the public convenience and necessity is not supported by the evidence in the record or by its findings of fact. The issue of public convenience and necessity is ordinarily one of fact and the determination of what is consistent with the public convenience and necessity is one which is peculiarly for the determination of the regulatory authority. *Application of Crusader Coach Lines, Inc.,* 213 Neb. 53, 327 N.W.2d 98 (1982); *Application of Schroetlin,* 210 Neb. 508, 315 N.W.2d 630 (1982).

■ The evidence reflects that from January 1, 1983 through May 31, 1983, Basin lost more than $13,000 in its trucking operation while paying Getter more than $97,000 under the lease agreements. A spokesman for MGF Oil Corporation testified that the company anticipates a continual increase in its North Dakota operations and that it would like to continue to make use of Basin's services in the future. A Coastal Oil and Gas Corporation spokesman testified that since Basin established its Dry Creek disposal well, the cost savings for the company have been significant, and that if it were to lose Basin's services, it would incur higher operating costs. A spokesman for Operators, Inc., testified that the company anticipates that it will continue to expand its drilling operations in North Dakota and that it relies upon and will continue to need Basin's services. A spokesman for Apache Corporation testified that the company has received cost savings from using Basin's services and that it has experienced difficulties with other carriers in the area. A Ladd Petroleum spokesman testified that the company has received excellent motor carrier service from Basin.

We believe the PSC properly considered the possible consequences to Basin's trucking operations if it were required to continue to operate under lease arrangements with Getter as well as the effect it would have on the shipping public which has come to rely on Basin's services. The record amply supports the PSC's finding that granting Basin its own operating authority is consistent with the public convenience and necessity.

Getter asserts that the PSC's findings and conclusions regarding the effect of the proposed service on other existing transportation facilities is not supported by the evidence. The PSC determined that:

"None of the protesting common motor carriers have suffered adversely from competing with Applicant for the business of the shippers supporting the instant application over the past two and one-half years. Under these circumstances, it cannot be concluded that the granting of common motor carrier authority to the Applicant to continue the service initiated under contract with a certificated carrier would cause any detriment to existing carriers."

Getter asserts that the granting of the application will result in a diversion of traffic that Getter has been experiencing under its leases with Basin and that the diversion of traffic from Getter to Basin will have an adverse effect on its business. However, the traffic Getter asserts would be diverted from it to Basin largely consists of customers who were using Basin's services before it entered into leases with Getter and customers Basin solicited while providing services under the leases.

More importantly, our regulatory scheme does not attempt to protect existing certificate holders from all competition. *See Application of Hvidsten*, 78 N.D. 56, 66, 48 N.W.2d 26, 32 (1951). In *Application of Ditsworth*, 78 N.D. 3, 8, 48 N.W.2d 22, 25 (1951), this court recognized the "intention on the part of the legislature to

depart from the policy of controlled monopoly in the field of transportation and permit motor carrier competition under the control of the Public Service Commission within the limits prescribed by the statutes." This commitment toward the development of a healthy competitive atmosphere in the transportation field was further recognized in *Power Fuels, supra,* and reaffirmed by the Legislature through its 1981 amendments to § 49–18–14, N.D.C.C. *See* 1981 N.D.Sess.Laws Ch. 479, § 8.

The evidence establishes that the only demonstrable adverse effect Getter would experience by the granting of the application is the loss of revenue it received from transportation provided through its lease arrangements with Basin. During the entire period of the lease, that revenue totaled approximately $157,000, which the PSC has estimated to be less than 1.5 percent of Getter's North Dakota revenues for 1982. The PSC apparently determined that the division of business would not seriously interfere with the services of existing certificated carriers and would not decrease their earnings to a point that would require them to cease operations. *See Application of Ditsworth, supra.* We conclude that the PSC's findings and conclusions regarding the effect of the proposed service on other existing transportation facilities are amply supported by the evidence.

## II

Matador and Power Fuels assert that Basin's motor carrier operations conducted through its various lease arrangements between April 1981 and July 1983 were in violation of certain provisions of Chapter 49–18, N.D.C.C., and Chapter 69–03–06, N.D.A.C., and that the PSC cannot issue a certificate of public convenience and necessity to an applicant based on evidence of its past unlawful operations.[2] They contend that Basin operated unlawfully when it transported water for certain oilfield shippers without a contract carrier permit, transported water for Ladd Petrole-

---

**2.** The PSC asserts that Matador and Power Fuels failed to raise this issue during the administrative agency proceedings, and therefore, that they have waived any right to raise the issue on appeal. We have examined the briefs filed with the PSC after the administrative hearing but prior to the date the PSC issued its decision, and

um over private roads without a contract carrier permit, and operated under leases to Getter without adequate supervision and control from Getter. Basin and the PSC argue that Basin's operations were not unlawful. In the alternative they argue that if Basin's operations were unlawful, the PSC is not barred from granting the certificate because Basin conducted its operations in good faith and not in open defiance or willful disregard of the law.

■ We need not determine if Basin's operations in this case were lawful, because even if they were not, we agree that the PSC was not thereby precluded from granting Basin a certificate of public convenience and necessity.

In *Power Fuels, supra,* this court addressed a somewhat analagous issue. In that case, Power Fuels sought a certificate of public convenience and necessity authorizing it to transport crude oil, water, and salt water. The appellant argued that the PSC's determination that Power Fuels was fit, willing, and able to perform the service for which the authority was sought was in error because Power Fuels had been transporting liquefied petroleum gas [LPG] without a certificate of authority. We disagreed, stating:

"[T]he conclusion of the PSC that such activity, if it were illegal, would not prevent the granting of the authority sought, is controlling. If we were to conclude that Power Fuels had transported LPG without a certificate, contrary to law, the question would still remain whether or not such activity would prevent the PSC from granting a certificate of authority to transport other commodities. This is a matter peculiarly within the discretion of the PSC. Because the PSC's conclusion is within its discretion, and because of the record before the PSC, we will not substitute our judgment for that of the PSC on this appeal." *Power Fuels, supra,* 283 N.W.2d at 227.

■ We agree with the view held in many jurisdictions that public convenience and necessity can be established by evidence of past illegal operations which have

been conducted under color of authority, in good faith, and not in intentional or willful disregard of the law. *See, e.g., Crichton v. United States,* 56 F.Supp. 876 (S.D.N.Y. 1944), *aff'd,* 323 U.S. 684, 65 S.Ct. 599, 89 L.Ed. 554 (1945); *Red Ball Motor Freight, Inc. v. Public Utilities Com'n,* 185 Colo. 438, 525 P.2d 439 (1974); *Dilts Trucking, Inc. v. Peake, Inc.,* 197 Neb. 459, 249 N.W.2d 732 (1977); *Greyhound Lines v. New Mexico State Corp.,* 94 N.M. 496, 612 P.2d 1307 (1980); *Frank Cartage Div., Etc. v. Public Utilities,* 48 Ohio St.2d 180, 358 N.E.2d 523 (1976); *Lancaster Transp. Co. v. Pennsylvania Public Utility Com'n,* 181 Pa.Super. 129, 124 A.2d 380 (1956); *but see McTyre v. Bevis,* 300 So.2d 1 (Fla.1974).

■ The PSC made no findings or conclusions regarding the legality of Basin's prior operations. Nevertheless, because the application was granted by the PSC we can assume that the PSC found Basin's operations to be legal, or, if illegal, that the operations were conducted in good faith, and not in intentional or willful disregard of the law. There is no evidence in the record upon which a contrary conclusion can be drawn. We therefore conclude that the PSC did not err in considering evidence of Basin's prior operations or in granting Basin's application for a certificate of public convenience and necessity.

The judgment is affirmed.

ERICKSTAD, C.J., GIERKE, J., PEDERSON and ILVEDSON, Surrogate Justices, and HATCH, District Judge, concur.

ILVEDSON, Surrogate Justice, sitting in place of VANDE WALLE, J., disqualified.

HATCH, District Judge, sitting in place of Justice PAUL M. SAND who died on December 8, 1984.

Surrogate Justice PEDERSON participated in this case by assignment pursuant to § 27–17–03, N.D.C.C.

conclude that the issue was adequately raised in the briefs to preserve it for review.