**TRULL NURSING HOME, INC.**

v.

**STATE of Maine DEPARTMENT OF HUMAN SERVICES.**

Supreme Judicial Court of Maine.

Argued Nov. 5, 1982.

Decided June 9, 1983.

Sanborn, Moreshead, Schade & Dawson, Linda B. Gifford (orally), Peter T. Dawson, Augusta, for plaintiff.

Edward E. White, Jr. (orally), Asst. Atty. Gen., Dept. of Human Services, Augusta, for defendant.

Before GODFREY, NICHOLS, ROBERTS, CARTER and VIOLETTE, JJ.

GODFREY, Justice.

Plaintiff Trull Nursing Home, Inc. ("Trull") is the operator of an intermediate-care nursing facility in Biddeford and a participant in the Maine Medical Assistance Program ("Medicaid"), operated by the Department of Human Services ("Department") pursuant to 22 M.R.S.A. § 10 and ch. 855 (§§ 3172 *et seq.*) (1980 & Supp.1982–83). Medicaid pays for the provision of medical care to eligible indigent persons with both state and federal funds in accordance with title XIX of the Social Security Act, as amended, 42 U.S.C.A. ch. 7, subch. XIX (§§ 1396 *et seq.*) (1974 & Pamph.1981). *See also* 42 U.S.C.A. § 1383c (1974).

This action arises from a decision by the Department denying Trull part of the reimbursement claimed by Trull under the Medicaid program. In reimbursing Trull for its expenses incurred in providing Medicaid services for the periods January 1, 1976 through June 30, 1977 and July 1, 1977 through June 30, 1978, the Department disallowed certain depreciation expenses claimed by Trull in connection with its purchase of the nursing home facility. The Department's auditors determined that the transaction was not bona fide, that Trull and Marion Stickney, then Trull's sole shareholder, from whom Trull purchased the building, were "related" parties, and that Trull was therefore not entitled to any depreciation reimbursement in excess of Mrs. Stickney's cost basis.

Trull objected to the Department's decision and requested an administrative hearing pursuant to 5 M.R.S.A. ch. 375, subch. IV (§§ 9051 *et seq.*) (1979 & Supp.1982–83). Trull argued that (1) the sale of the facility was in fact a bona fide sale entitling the corporation to use the purchase price as its basis for purposes of depreciation reimbursement; and (2) the Department was estopped from refusing to use the purchase price paid to Mrs. Stickney as Trull's basis.[1] After a hearing, the administrative hearing officer upheld the Department's determination and denied Trull's appeal. Trull then brought the present action in Superior Court (York County) pursuant to M.R.Civ.P. 80B. The Superior Court vacated the Department's decision and remanded the case for further proceedings on the issue of estoppel in light of this Court's holding in *Maine School Administrative District No. 15 v. Raynolds,* 413 A.2d 523 (Me.1980),[2] and for a determination of the proper value of any nursing home property when it was acquired by Mrs. Stickney and, later, when it was transferred to Trull. The Department moved to amend the judgment pursuant to M.R.Civ.P. 59(e). The motion was denied, and this appeal followed. We reverse the judgment of the Superior Court.

## I.

The pertinent facts are as follows: the facility in question, once a hospital and now a nursing home, was formerly owned by Dr. Laura Stickney. On her death in 1961, she left it to her son, Richard F. Stickney, Sr., who in turn, left it at his death in September, 1973, to his wife, Marion Stickney. In the same year, Trull was incorporated to operate the facility as a nursing home. Trull took a lease on the facility from Mari-

---

1. This case presents only the issue of Trull's proper basis for purposes of depreciation reimbursement.

2. The decision of the hearing officer was rendered prior to the decision of the Law Court in *Maine School Administrative District No. 15 v.*

*Raynolds,* 413 A.2d 523, 533 (Me.1980), which held that "the application of equitable estoppel is *not absolutely* precluded solely because it is invoked against activity by a governmental official or agency in the discharge of a governmental function."

on Stickney for a rental of $2,000 per month.

On December 31, 1974, the facility was sold to Trull by Marion Stickney, then the sole stockholder of the corporation. The purchase price of $200,000 was established by Mrs. Stickney on the basis of a tax valuation of the land, buildings and equipment performed by the City of Biddeford. Mrs. Stickney took back financing from Trull on the purchase price at 12% per annum over twenty-five years, with resulting monthly payments of $2,106.50.

Before the sale, Mrs. Stickney consulted her attorney and her accountant concerning the transaction. The attorney telephoned an auditing supervisor for the Department, Richard Bailey, to discuss the proposed sale. At the hearings in this case, neither the attorney nor Mr. Bailey remembered significant parts of that conversation. However, the attorney sent a letter confirming the conversation to Mr. Bailey the following week, stating his understanding that "as long as the sales price does not exceed the current fair market value of the assets, the corporation would be entitled under the principles of reimbursement to include in the reimbursement formula depreciation on the assets it purchases, using the purchase price or fair market value, and any interest on its debt to the principal shareholder."[3]

In March, 1976, the Department conducted a limited-scope audit for the year ending December 31, 1975. Depreciation on the facility for that year was reimbursed consistently with a basis of $175,000, determined in relation to the 1974 sale price.[4] For the periods January 1, 1976 through June 30, 1977 and July 1, 1977 through June 30, 1978, the Department conducted full-scope audits of the costs submitted by Trull for Medicaid reimbursement. During those full-scope audits, the appropriate basis for the payment of depreciation to Trull under applicable reimbursement regulations was questioned by the Department, and Trull was asked to provide the Department with additional information to assist in determining the facility's appropriate cost basis. The information requested included the appraisal report for the nursing home facility and a copy of the depreciation schedule from Mrs. Stickney's federal income tax return before her transfer of the facility to Trull.

After considerable delay in the audit settlement as a result of a dispute over the Department's information request, Trull instituted an action ("*Trull I*") in Superior Court to compel completion of the audit. Trull contended that the Department was not entitled to the information requested and that it should be estopped from refusing to recognize Trull's full purchase price as the basis for depreciation because of the alleged statements of Richard Bailey to Mrs. Stickney's attorney. In the course of *Trull I*, an extensive evidentiary hearing was conducted in the Superior Court on the estoppel issue. The transcript of that hearing was later incorporated by stipulation as the Department's hearing record on that issue.

In its decision in *Trull I*, the Superior Court declined to reach the estoppel question but decided that the Department had a right to the financial information requested. In accordance with that decision, the requested information was submitted to the

---

3. Before October 1, 1975, intermediate care facilities in Maine had the option of being reimbursed either on a cost-related system or on the earlier system of "flat-rate" payments (per-diem rate established without regard to the costs incurred by the particular facility). Effective October 1, 1975, Maine law required that all intermediate care facilities be reimbursed on a cost-related basis. *See* 22 M.R.S.A. § 1708 (1980). The record reflects that Trull had already converted to the cost-based system on January 1, 1975.

The change to a cost-related basis for reimbursement was required by federal legislation. *See* 42 U.S.C.A. § 1396a(a)(13)(E) (1974), later redesignated § 1396a(a)(13)(A) (Pamph.1981).

4. Although the price of the land and buildings was $200,000, the inflation-adjusted value of the buildings and equipment, according to Trull, was $175,000. Since land is non-depreciable, reference is made only to the depreciable basis for the buildings and equipment.

Department, ending the *Trull I* litigation. The depreciation schedule from Marion Stickney's 1974 tax return showed a depreciation basis of $75,000 for the nursing home building. That figure was thereupon adopted by the Department as Trull's depreciable basis in the building.

## II.

During the time covered by the audits disputed in this action, Medicaid payments by the Department were made directly to providers, based on allowable costs incurred by the providers in accordance with duly promulgated state regulations known as the Principles of Reimbursement, effective July 1, 1972 (*"1972 Principles"*) and the Principles of Reimbursement for Long Term Care Facilities, effective January 1, 1978, (*"1978 Principles"*).[5] Under the cost-based reimbursement system, not all costs incurred by participating providers are "allowable costs" qualifying for reimbursement by the Department. Reimbursement of providers of services must be based on the "reasonable cost" of services covered under the program. *1972 Principles* § 1; *1978 Principles* § 1010.

In determining "reasonable cost" under Medicaid, the Department must look for guidance to the federal government's administration of the cost-related reimbursement system for the operation of Medicare pursuant to title XVIII of the Social Security Act, 42 U.S.C.A. ch. 7, subch. XVIII

(§§ 1395 *et seq.*) (1974 & Pamph.1981). At all times relevant to this action, federal regulations governing state Medicaid reimbursement systems specifically incorporated Medicare limitations on payments to providers of health services. Medicaid payments were not (and are not) permitted to exceed "an upper limit determined in accordance with the principles of reimbursement for provider costs" under the Medicare Act. 45 C.F.R. § 250.30(b)(6) (1976). *See* 42 C.F.R. § 447.316 (1978); 42 C.F.R. § 447.272 (1982).[6] Medicare reimbursement principles, in turn, are provided for by federal regulations in 42 C.F.R. ch. IV, subch. A, pt. 405, subpt. D (§§ 405.401 *et seq.*) (1982).[7] The 1972 and 1978 Principles track closely the Medicare reimbursement regulations.

■ Trull argues that the state's 1972 and 1978 Principles of Reimbursement do not apply to this case, that those Principles were adopted only to administer payments to providers using the cost-related reimbursement system, and that because Trull purchased the nursing home from Mrs. Stickney before January 1, 1975, while Trull was still on a flat-rate payment basis, any determination of basis for depreciation ascertained under the Principles is inapplicable to the 1974 sale. The argument is not persuasive. The Principles of Reimbursement were promulgated to establish an accounting methodology to be used in determining the manner in which nursing home

5. The *1978 Principles* are applicable only to the last six months of the two-and-one-half year audit period covered by this case. The differences between the two sets of Principles reflect in large measure changes in the cognate federal statutes and regulations.

6. Federal regulations governing the operation of state Medicaid programs were twice recodified without substantial substantive change. Medicaid reimbursement regulations codified at 45 C.F.R. at part 250 were redesignated and transferred to 42 C.F.R. at part 450, 42 Fed. Reg. 52827 (September 30, 1977), and were *subsequently reorganized within title 42 C.F.R.* pursuant to 43 Fed.Reg. 45176 (Sept. 29, 1978).

7. Title 20 of the Code of Federal Regulations was recodified in title 42 in 1977 without

change in section numbers. 42 Fed.Reg. 52826 (Sept. 30, 1977).

Additional materials interpreting the Medicare reimbursement principles, known as the Medicare Provider Reimbursement Manual (HIM–15), are published by the United States Department of Health and Human Services and available in the CCH Medicare and Medicaid Guide. The Department has customarily used the Medicare Provider Reimbursement Manual to interpret its own principles and to ascertain allowable costs in the absence of controlling state principles. *See 1978 Principles,* Introduction. For the legal status of the Medicare Provider Reimbursement Manual, *see Rio Hondo Memorial Hospital v. United States,* 689 F.2d 1025, 1029 n. 4 & 1033 n. 10 (Ct.Cl.1982).

costs are reimbursable during the relevant audit periods. *See* 22 M.R.S.A. § 1708. It is irrelevant to such a determination that the sale took place before the facility was placed on a cost-reimbursement basis. *Rio Hondo Memorial Hospital v. United States,* 689 F.2d 1025, 1032–33 (Ct.Cl.1982) (federal Medicare regulations must govern reimbursement of depreciation costs based on a related-party purchase of the hospital that occurred some three months before the effective date of the Medicare Act).

Quite properly, Trull does not argue that application of the state's Principles of Reimbursement results in any retroactive taking. Under the flat-rate payment program in effect at the time of the sale, there was *no* provision for the reimbursement of depreciation costs. Because Trull had no prior expectation of reimbursement on a cost basis, application of the cost-related Principles does not divest Trull of any previously held rights. *See, e.g., In-Home Health Care Service v. Harris,* 512 F.Supp. 84, 90 (N.D. Ill.1981) (reimbursement of consulting costs); *Pasadena Hospital Association, Ltd. v. United States,* 618 F.2d 728, 735 (Ct.Cl. 1980) (reimbursement of rent paid to related organization).[8] The Superior Court was correct in holding that the Department's 1972 and 1978 Principles of Reimbursement were applicable as a basis for determining plaintiff's costs for the critical two-and-one-half-year period.

### III.

Among the costs reimbursable to intermediate care facilities is depreciation on buildings and equipment. *1972 Principles* § 2(a); *1978 Principles* § 3000. As a rule, the amount of reimbursable depreciation is based on the cost of acquiring the asset. *1972 Principles* § 2(a); *1978 Principles* § 3011. In general, when a facility is purchased as an ongoing operation, the cost basis is the cost to the purchaser, provided the sale is bona fide and for not more than the fair market value of the facility at the time of sale. Section 2(e) of the *1972 Principles* provided as follows:

(e) *Establishment of Cost Basis on Purchase of Facility as an Ongoing Operation.* In establishing the cost basis for a facility purchased as an ongoing operation, the price paid by the purchaser shall be the cost basis where the purchaser can demonstrate that the sale was a bona fide sale and the price did not exceed fair market value of the facility at the time of sale. The cost basis for depreciable assets shall not exceed the fair market value of those assets at the time of sale. If the purchaser cannot demonstrate that the sale was bona fide, the purchaser's cost basis shall not exceed the seller's cost basis, less accumulated depreciation.

However, under either departmental or federal Medicare reimbursement principles, the provider's acquisition cost is not used as the cost basis for purposes of depreciation if the provider obtained the asset from an organization related to it by "common ownership or control." *1972 Principles* § 11; *1978 Principles* §§ 3021, 4130; 42 C.F.R. § 405.427. Costs applicable to facilities furnished to the provider by a related organization are includable in the allowable cost to the provider, but only at the cost to the related organization. *1972 Principles* § 11; *1978 Principles,* §§ 3021, 4130. *See also* 42 C.F.R. § 405.427(b).

Trull does not contest the proposition that Marion Stickney, as sole shareholder of Trull in 1974, was a "related" provider or organization within the meaning of the applicable Principles. *See 1972 Principles* § 11(b); *1978 Principles* §§ 3021, 4132.1;

---

**8.** Even if the application of cost-based principles to the 1974 sale were to be deemed to have some sort of retroactive effect, the mere fact that the economic consequences were inconsistent with Trull's reasonable expectations would not necessarily constitute an unconstitutional taking. *See Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752, 767 (1976); *Adams Nursing Home of Williamstown, Inc. v. Mathews,* 548 F.2d 1077, 1081 (1st Cir.1977).

42 C.F.R. § 405.427.[9] Instead, relying on *South Boston General Hospital v. Blue Cross of Virginia,* 409 F.Supp. 1380 (W.D. Va.1976), Trull argues that the related-party principles do not apply to the single sale of the buildings and equipment of the facility but apply only to ongoing, current transactions where one party is repeatedly supplying services, facilities, or supplies to the other. Accordingly, Trull's position is that under section 2(e) of the *1972 Principles,* it should be allowed to use its acquisition cost in determining its basis for reimbursement because the transaction was otherwise bona fide and for fair market value; in short, that the 1974 transaction came within the general provision of section 2(e) of the *1972 Principles.* The Department asserts that the provisions of section 11 of the *1972 Principles* overrode those of section 2(e) because Trull acquired the assets from a related provider or organization, even though the transaction was a single sale.

■ The agency's interpretation of its own regulations is entitled to considerable deference on judicial review. *Central Maine Power Company v. Public Utilities Commission,* 455 A.2d 34, 44 (Me.1983). Such deference is particularly appropriate in an area as complex as Medicaid reimbursement. *See, e.g., Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service, Inc.,* 689 F.2d 1112, 1117 (1st Cir. 1982). The related-party regulations were intended to disallow profit from "sweetheart contracts", under which a provider could make purchases from itself, in effect, through a related company. If permitted to charge the government the amounts charged by the related party, the provider would ultimately recover from the government not merely the cost of the facilities sold but the related party's profit as well. *See Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 134 (9th Cir.1980). The related-party provisions are prophylactic measures to ensure that "when the parties to a transaction are related because of common ownership or control, there should be no revaluation upward of the property by fiat of the joint controlling interest. Medicare is not to pay for, or be loaded with, increased costs brought about simply by a sale from one entity to its *alter ego.*" *Jackson Park Hospital Foundation v. United States,* 659 F.2d 132, 137 (Ct.Cl.1981); *see also American Hospital Management Corporation v. Harris,* 638 F.2d 1208, 1213 (9th Cir.1981).

Section 2(e) of the 1972 Principles, which paralleled the federal regulation now codified at 42 C.F.R. § 405.415(g), applied in terms to the sale of a facility as an ongoing operation under the state Medicaid program. Even on the assumption, *arguendo,* that the sale in this case was bona fide and for fair market value, we find that the general cost allowance of section 2(e), applicable to any purchase of an ongoing facility, is controlled by the rule of section 11,[10] which categorically disallows the use of acquisition cost in "related party" transac-

**9.** Section 11 of the *1972 Principles,* which tracked the cognate federal Medicare regulation and is closely followed in section 4130 of the *1978 Principles,* provided as follows:

11. COST TO RELATED ORGANIZATIONS
(a) *Principle.* Costs applicable to services, facilities and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.
(b) *Definitions.*
(1) *Related to Provider.* Related to provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, and supplies.
(2) *Common Ownership.* Common ownership exists when an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.
(3) *Control.* Control exists where an individual or an organization has the power, directly or indirectly significantly to influence or direct the actions or policies of an organization or institution.

**10.** *See supra* n. 9.

tions. Except for *South Boston,* the federal cases that have analyzed the similar federal Medicare reimbursement system have likewise decided that the related-party provision (42 C.F.R. § 405.427) controls as a specific exception to the general allowance of a cost basis (42 C.F.R. § 405.415(g)), regardless of the fairness of the particular transaction. *E.g., Goleta Valley Community Hospital v. Schweiker,* 647 F.2d 894, 897–98 (9th Cir.1981); *Hillside Community Hospital v. Mathews,* 423 F.Supp. 1168, 1176 (N.D.Cal.1976). *See also Rio Hondo Memorial Hospital,* 689 F.2d at 1033.

Moreover, the *1978 Principles* have altogether dispensed with the general bona-fide language of section 2(e) of the *1972 Principles.* With respect to the sale of facilities from related organizations, the *1978 Principles* specifically provide that the purchaser's basis for depreciation shall not exceed the related seller's basis under the program, less accumulated depreciation. *1978 Principles* § 3021.[11]

■ Trull's argument, that the related-party provisions do not apply to the single sale of a facility, rests heavily on the holding of *South Boston,* which has been either rejected or distinguished away by other courts that have considered the question. *See, e.g., Shaker Medical Center Hospital v. Secretary of Health and Human Services,* 686 F.2d 1203, 1208–09 (6th Cir.1982); *American Hospital Management Corporation,* 638 F.2d at 1213 n. 9; *Hillside Community Hospital of Uriah,* 423 F.Supp. at 1175; *Jackson Park Community Hospital Foundation,* 659 F.2d at 137 n. 12; *Stevens Park Osteopathic Hospital, Inc. v. United States,* 633 F.2d 1373, 1379 (Ct.Cl.1980). The rationale of those decisions is that the related-party provisions are prophylactic measures designed to guard against collusive dealing

between related organizations and that they apply to a one-time sale as well as to a transaction creating an ongoing relationship. We agree. Trull's depreciable basis for Medicaid purposes could not exceed that of the seller, Marion Stickney.

### IV.

Trull argues that if it must adopt Mrs. Stickney's basis for purposes of depreciation reimbursement, the department's determination of her basis was not rational or supported by substantial evidence.

Section 11 of the *1972 Principles* refers to the "cost" to the related organization. Although Mrs. Stickney inherited the nursing home from her husband in 1973 and hence incurred no actual cost of acquisition, the Department has never argued that her basis should be zero. Instead, the Department relies on her 1974 income tax return, which reported a cost basis of $75,000 in the inherited property. The $75,000 was the same figure that had been used by Mr. Stickney in his income tax returns before his death. He had derived that figure, in turn, from the original basis, used for tax purposes, acquired from his mother's estate, plus improvements and less depreciation taken.

Trull argues that the Department erred in adopting Mrs. Stickney's reported tax basis of $75,000. Trull asserts that the use of that figure by her for income tax purposes was a mistake—the repetition of an error made by Mr. Stickney's estate attorneys when they incorrectly used Mr. Stickney's own basis as inventory value rather than the fair market value at the time of his death. Trull contends that Mrs. Stickney's basis should have reflected the fair market value of the asset at the time of her inheritance, as is permitted for income tax purposes by IRC § 1014.[12] Apparently, the

---

11. Terms used in section 3021 of the *1978 Principles* are defined in section 4130, which tracks section 11 of the *1972 Principles* and federal Medicare regulations at 42 C.F.R. § 405.427. Section 4130 applies more generally to related-party transactions whether or not the related party has earlier been a provider under the state Medicaid program.

12. IRC § 1014 provides for a "step-up" in basis to mitigate the harshness of the carry-over basis principle and avoid taxing the unrealized appreciation in value that occurs during a decedent's lifetime. 4 J. Rabkin & M. Johnson, *Federal Income, Gift and Estate Taxation* § 54.11 (1982).

Superior Court adopted that reasoning in ordering the case remanded for a determination of the fair market value of the facility at the time of Mr. Stickney's death.

Although for income tax purposes Mrs. Stickney's basis in the property should have been its fair market value at the time of her inheritance, the same result is not appropriate for purposes of Medicaid reimbursement. In the Medicare system, no increase in the basis for depreciation is permitted when a provider acquires an asset by death of the former owner. Unlike an arm's length, bona-fide purchase by a non-related party, succession to property on death entails no new acquisition cost. Thus the Federal Provider Reimbursement Manual provides as follows:

> Where an asset that has been used or depreciated under the program is donated to a provider, or where a provider acquires such assets through testate or intestate distribution, *e.g., a widow inherits a skilled nursing facility upon the death of her husband and becomes the owner of a newly certified provider, the basis of depreciation for the asset is the lesser of the fair market value, or the net book value of the asset in the hands of the owner last participating in the program.* The basis for depreciation shall be determined as of the date of donation or the date of death, whichever is applicable. The net book value of the asset is defined as the depreciable basis used under the

program by the asset's last participating owner less the depreciation recognized under the program.

Provider Reimbursement Manual, part 1, section 114.2, 1 CCH Medicare and Medicaid Guide, para. 4749 (emphasis supplied). Determination of basis in order to determine depreciation of inherited assets is specifically addressed in the *1978 Principles*,[13] which essentially adopt the rules covering donation and inheritance of assets in section 114.2 of the Medicare Provider Reimbursement Manual.[14]

Quite correctly, Trull argues that those provisions are not in terms applicable to the present case because Mr. Stickney was always reimbursed on a flat-rate basis during his lifetime, with the result that he never used a depreciable basis for the facility under the program. He had used a depreciable basis of $75,000 for the facility in preparing income tax returns but not in operating under the Medicaid program.

Even so, it does not follow that the Department impermissibly used the $75,000 tax-return figure as the depreciable basis for the facility after its transfer to Trull. At the departmental hearing, it became evident that there were several rational methods for attributing a depreciable basis to Mrs. Stickney for Medicaid purposes as of the time she acquired the facility. None of those methods was without one or more objectionable features, and the record does

---

**13.** Section 3011.2 of the *1978 Principles* provides that depreciation must be

> [b]ased on the lesser of the net book value of the asset, or the fair market value at the time of donation (or inheritance) in the case of donated (or inherited) assets. Where an asset that has been used or depreciated under the program is donated to a provider, or where a provider acquires such assets through testate or intestate distributions, *e.g.,* a widow inherits a skilled nursing facility upon the death of her husband and becomes a newly certified provider; the basis of depreciation for the asset is the lesser of the fair market value, or the net book value of the asset in the hands of the owner last participating in the program. The basis for depreciation shall be determined as of the

date of donation or the date of death, whichever is applicable.

Section 3012.3 provides:

> *Net book value.* The net book value of the asset is defined as the depreciable basis used under the program by the asset's last participating owner less the depreciation recognized under the program.

**14.** The *1972 Principles* do not address the basis of inherited property for purposes of depreciation reimbursement. In the light of the quoted provision of the Federal Provider Reimbursement Manual, we find the Department's application of section 3011.2 of the *1978 Principles* to be a fair construction of the regulatory scheme embodied in the *1972 Principles*. See text *supra* at notecall 8.

not establish that any one of them was clearly superior to the others.

 The method resorted to by the Department, of using the $75,000 figure used by Mrs. Stickney as her depreciable basis for income tax purposes in 1974, is consistent with the spirit and purpose of the federal and state Medicaid regulations, even though the transactions involved did not come precisely within the letter of any particular regulation. The intent is apparent from the federal regulations and manual, and from the state's 1972 and 1978 Principles of Reimbursement, that no step-up will be recognized in the depreciable basis of a Medicaid facility except when it is transferred by a bona fide sale to a non-related party. Even then, the step-up is limited to the fair market value of the facility at the time of purchase. *1978 Principles* § 3012.2. The intent is also apparent that where a facility is transferred otherwise than by bona fide sale to a non-related provider, the transferor's own depreciable basis, if lower than fair market value at the time of transfer, is to be taken as the basis for calculating depreciation. In such a case, if the transferor operated the facility on a cost-reimbursement basis, the depreciable basis after transfer will ordinarily be net book value; *i.e.*, the transferor's depreciable basis, less the depreciation recognized under the Medicaid program. In the present case, the facility had never been operated by the Stickneys on a cost-reimbursement basis; hence its "net book value" cannot be ascertained either at Mr. Stickney's death or at the time of the transfer to Trull. Nevertheless, because the transfer to Trull was to a related party, the Department did not act unreasonably in attributing to Mrs. Stickney, for use in the Medicaid program, the same depreciable basis that her husband had used in his income tax returns.[15]

V.

 Trull takes nothing by its argument that, as a result of Mr. Bailey's statement to Mrs. Stickney's attorney, the Department was estopped to deny Trull a depreciable basis of $175,000. This case is not one in which estoppel could be properly applied. Mr. Bailey was an auditor for the Department, and there was no valid reason to believe that he had authority to represent the official position of the Department on the matter in question.[16] The argument is without merit.

The entry is:

Judgment reversed.

Remanded for entry of judgment affirming the administrative decision.

All concurring.

---

**15.** *Cf. Federal Medicare Provider Reimbursement Manual*, pt. 1, § 134.3, 1 CCH *Medicare Medicaid Guide* ¶ 4867 (Medicare will not ordinarily recognize a historical cost of major depreciable assets in excess of the historical cost used for federal income tax purposes.)

**16.** Estoppel against the government should be "carefully and sparingly applied", *Milliken v. Buswell*, 313 A.2d 111, 119 (Me.1973), especially where application would have an adverse impact on the public fisc, *see Schweiker v. Hansen*, 450 U.S. 785, 786, 788, 101 S.Ct. 1468, 1470, 1471, 67 L.Ed.2d 685 (1980).