**SEBASTICOOK VALLEY HEALTH
CARE FACILITY, INC.**

v.

**STATE of Maine and the Department
of Human Services.**[1]

Supreme Judicial Court of Maine.

Argued Sept. 18, 1984.

Decided Nov. 7, 1984.

---

1. Michael R. Petit, Commissioner of the Department of Human Services, was originally named as a defendant, but only in his official capacity. We have thus removed his name from the caption.

Preti, Flaherty & Beliveau by John P. Doyle, Jr. (orally), Portland, for plaintiff.

Edward E. White, Jr., Asst. Atty. Gen. (orally), Augusta, for defendants.

Before McKUSICK, C.J., and ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

SCOLNIK, Justice.

Sebasticook Valley Health Care Facility, Inc. ("Sebasticook") operates an intermediate care nursing home in Pittsfield, Maine. It brought this action in the Superior Court, Kennebec County, under M.R.Civ.P. 80 c and 5 M.R.S.A. § 11001 *et seq.*, challenging a final decision of the Maine Department of Human Services that denied in part Medicaid reimbursement for two items of expense Sebasticook incurred in 1979: interest Sebasticook paid on a variable rate mortgage loan and fees it paid to a private accounting firm. The Superior Court affirmed the Department's decision and Sebasticook has sought further appellate review in this Court. 5 M.R.S.A. § 11008. We affirm the judgment of the Superior Court.

I

Sebasticook provides care to patients eligible for Medicaid, a program jointly funded by the state and federal governments in accordance with Title XIX of the Social Security Act, 42 U.S.C.A. Ch. 7, subch. XIX (§§ 1396 *et seq.*) The Medicaid program is administered in Maine by the state Department of Human Services under 22 M.R.S.A. §§ 10, 12, and 3172 *et seq.* The Department pays for the medical care of eligible recipients by reimbursing the nursing home (a "provider" of services) for its expenses. 22 M.R.S.A. § 1708(2). Reimburs-

able expenses include not only the salaries and cost of supplies incurred, but also the cost of the facilities used. The latter is reimbursed through two accounts, a depreciation allowance, which pays the principal amount of funds used by the provider to acquire its facilities, and an interest allowance, which pays the interest the provider incurs on those funds. In effect, the Medicaid program amortizes the original cost of the nursing home for its operator.

This Court considered a challenge to the Department's reimbursement of principal acquisition funds in *Trull Nursing Home, Inc. v. State Dep't of Human Services,* 461 A.2d 490 (Me.1983). We noted there that reimbursement is,

> based on allowable costs incurred by the providers in accordance with duly promulgated state regulations known as the ... Principles of Reimbursement for Long Term Care Facilities, effective January 1, 1978 .... Under the cost-based reimbursement system, not all costs incurred by participating providers are "allowable costs" qualifying for reimbursement by the Department. Reimbursement of providers of services must be based on the "reasonable cost" of services covered under the program.

461 A.2d at 494. The "reasonable cost" is determined by application of the Principles of Reimbursement, promulgated by the Department under 22 M.R.S.A. § 42(1). The principles, in turn, follow the requirements of the federal Social Security Act, 42 U.S. C.A. §§ 1396 *et seq.,* and 42 C.F.R. §§ 405.-401 *et seq.* To be reimbursed, a provider submits an annual "cost report" to the Department. 1978 Principles, §§ 2010–2055. The Department's Division of Audits reviews this report to determine whether all the claimed items are allowable. It makes adjustments for items which it deems unreasonable under the principles, and disallows reimbursement to the provider for those items.

In Sebasticook's case, the Department disallowed two claimed items of expense for 1979, a portion of the interest Sebasti-

cook paid on the funds it borrowed to finance the facility, and a portion of the fees it paid to a private accounting firm. Sebasticook challenged the disallowance through administrative review, culminating in an adjudicatory hearing before a Department Hearing Officer. 5 M.R.S.A. §§ 9051 *et seq.* The Hearing Officer upheld the disallowance. In his decision he made detailed findings of fact, explained the interrelationship of the principles, and applied the principles to the facts in accordance with 5 M.R.S.A. § 9059. The Commissioner adopted that decision as the Department's final decision. The Superior Court affirmed, holding that the Department's factual findings were fully supported by substantial evidence on the record and that its conclusions were not inconsistent with the applicable law and regulations.

▉▉▉ On appeal from Superior Court review of the Department's decision, where the Superior Court functions as an intermediate appellate court undertaking judicial review of an administrative record, the Law Court will examine that record directly. *See Lundrigan v. Maine Labor Relations Board,* 482 A.2d 834, 835–836 (Me. 1984); *Council 74, AFSCME v. Maine State Employees Ass'n,* 476 A.2d 699, 703 (Me.1984). We use the same standards of review as the Superior Court, that is, whether the factual findings are supported by substantial evidence on the whole record, *Seven Islands Land Co. v. Maine Land Use Regulation Comm'n,* 450 A.2d 475, 479 (Me.1982), and whether, barring a demonstrable error of law, the Department's conclusions are reasonable. *Maine Water Co. v. Public Utilities Comm'n,* 482 A.2d 443, 451 (Me.1984); *Trull Nursing Home, Inc.,* 461 A.2d at 499. After a careful review of all the evidence considered by the Department and of the pertinent state and federal law, we conclude that the Department did not act unreasonably in denying full reimbursement to Sebasticook. Thus we affirm the Superior Court's judgment.

## II

*Reimbursement of Interest Costs*

### A. *Background*

During 1977, Dr. John Ford, the sole stockholder of Andrews Nursing Home, Inc., in turn the sole owner of Sebasticook, sought the Department's approval to construct the Sebasticook facility. Under § 1122 of the Social Security Act, 42 U.S. C.A. §§ 1320a–1 *et seq.*, and 42 C.F.R. Part 100, this approval is a prerequisite to subsequent Medicaid reimbursement of a provider's expenses. Dr. Ford proposed to finance the project almost entirely with borrowed funds. He had obtained a commitment from the Oxford Bank and Trust for a twenty-year loan at an annual interest rate of 9%. This loan corresponded to Dr. Ford's planned twenty-year depreciation period on the facility. The Department informed him, however, that the new buildings would be assigned a forty-year depreciation period. As the extended depreciation reimbursement schedule would have caused Sebasticook cash-flow problems under the proposed loan, Dr. Ford decided to seek longer-term financing.[2]

He returned to the Oxford Bank where he negotiated a new, thirty-year loan. Before concluding the transaction there he also "shopped around locally," speaking to representatives of four other banks. Of those four, two simply did not offer commercial loans of the necessary length. The other two, Dr. Ford testified, "weren't interested." He did not explain further, and Sebasticook offered no other evidence on its efforts to secure financing or to determine what interest rates were available to a Maine nursing home contemplating large-scale construction.

The Oxford Bank agreed to lend Sebasticook $850,000. Andrews Nursing Home,

Inc.'s contribution to the project was $20,-000, a 2.3% equity share. In order to extend such a loan the bank needed a Farmers' Home Administration guarantee. It also needed to be able to sell part of the loan on the secondary market so that it would not carry by itself the entire risk of this highly leveraged situation. Accordingly, it insisted on a variable rate of interest that would change periodically to correspond to the prime rate established by the First National Bank of Boston. Sebasticook agreed to pay a rate of interest set at a certain amount higher than the prime rate. This "spread" was eventually fixed at 1¾% by a method not relevant here. Sebasticook's actual rate is redetermined every three months.

Meanwhile the Department of Human Services had given general § 1122 approval to the Sebasticook facility. That is a prerequisite to future reimbursement of a provider's expenses, but does not, by itself, ensure reimbursement. Accordingly, in an apparent effort to obtain advance approval of the variable rate loan from the Department, the Farmers' Home Administration prompted Dr. Ford to inquire "what they intend to do about this proposal."

Commissioner Smith replied to Dr. Ford on December 21, 1977. In pertinent part his letter said,

> This type of floating rate interest is rather new to the industry for mortgage loans. In checking our files, we can find no other instance where it has been handled in this manner. I do understand that short-term demand-type loans do have this provision added to them, but these are usually renewed every 90 days. If we were to accept this type of floating interest rate, we would be establishing a precedent which could result in all future mortgages being set up on this type of

**2.** As discussed above, the Department reimburses providers for their principal costs of acquiring facilities through the depreciation allowance. New construction being a capital expenditure, the total cost is reimbursed over the depreciation period of the facility: similar to the "useful life" for purposes of income tax depreci-

ation. The longer the period, the smaller the proportionate share of the total cost is reimbursed each year. Because a provider takes the reimbursement of depreciation into account in calculating net income, any extension of the depreciation period will reduce net income and require a change in the budget.

an interest procedure, which could be extremely costly to the State of Maine.

Therefore, we find at this time that we will be unable to issue a letter to the Farmers' Home Administration, stating that we would accept and pay for the interest as you have presented it to us in your letter. It would be necessary for the Department to abide by the regulations as spelled out in the Principles of Reimbursement, and apply the concept of reasonableness, which means that any portion of interest charged to your facility on your mortgage loan that reached the point of unreasonableness in comparison with other mortgage loans, would not be accepted as an allowable cost.

In a following telephone conversation with Deputy Commissioner Carney, Dr. Ford apparently did not attempt to pin down what the Department considered to be the "point of unreasonableness." Sebasticook's only evidence as to this conversation supports the Hearing Officer's conclusion that the Department warned Dr. Ford that Sebasticook would bear the risk of the high interest rates that, in fact, followed.

Nevertheless, Sebasticook went ahead, closing with the bank in March, 1978. It did not approach any other bank after December 21, 1977, nor did it attempt to make the comparison with other mortgage loans obtained by the nursing home industry to which Commissioner Smith's letter referred. It paid 10% interest until the end of the construction period, February 1, 1979, when the variable feature of the loan began. During 1979 it paid $114,883.21 in interest incurred at rates ranging from 13¼ to 15½%, i.e., 1¾% over the prime rate as redetermined each quarter.

When called upon to reimburse Sebasticook for its interest costs, the Department's Division of Audits conducted a preliminary survey of the rates paid by other nursing homes. It determined that 11½% was the maximum "reasonable" rate that a Maine nursing home could have obligated itself to pay in a transaction in early 1978. Its audit report of Sebasticook disallowed reimbursement of the amount paid in excess of 11½%, $26,596 of the total $114,-883.21.

The Department later conducted a more thorough survey at Sebasticook's request. It found that, although variable rate financing became more common for general commercial loans after 1978, no other Maine nursing home used it for long-term loans until 1981. The Department's evidence was, and the Hearing Officer was justified in finding, that,

at the time Sebasticook arranged its financing, other similar enterprises had been able to borrow funds at fixed rates of between 9.25 and 10.5 percent. During 1979, when the prime was consistently higher than it was in 1978, other nursing home operators were able to obtain fixed rate financing for new construction, at rates of 9.5% to 12%.

This conclusion was not based on evidence of many examples, but those used comprised the entire relevant sample; that is, all the Maine nursing homes that obtained financing for new construction or for acquisition between June, 1977 and December, 1979. Accordingly, the Department stood by its initial decision.

B. The Principles of Reimbursement.

The criteria used by the Department to disallow Sebasticook's excess interest costs are the 1978 Principles of Reimbursement for Long Term Facilities. These were promulgated in conformity with the federal Social Security Act and closely follow the federal guidelines for reimbursement which appear in 42 C.F.R. §§ 405.401 *et seq.* They may be interpreted with the aid of the Medicare Provider Reimbursement Manual found at CCH Medicare and Medicaid Guide, ¶¶ 4300 *et seq. Trull Nursing Home, Inc.,* 461 A.2d at 494, n. 7.

 It must be acknowledged at the outset that the principles do not specifically bar reimbursement of interest paid at a variable rate, nor that paid at rates above 11½%. The Department based the challenged action on its interpretation of these

broad guidelines. This Court will give considerable deference to an agency's interpretation of its own regulations, particularly in an area as complex as Medicaid reimbursement. *Trull Nursing Home, Inc.*, 461 A.2d at 496. *See Maine Water Co.*, 482 A.2d at 451. The burden is squarely on the challenger to demonstrate that the Department's action was arbitrary or based on an error of law. *Central Maine Power Co. v. Public Utilities Comm'n*, 455 A.2d 34, 38–9 (Me.1983); *New England Tel. & Tel. Co. v. Public Utilities Comm'n*, 448 A.2d 272, 287–88 (Me.1982). We find nothing arbitrary or unlawful about the Department's interpretation here.

The general principles, applicable to all reimbursable costs, are at §§ 1010–1023.[3] From the beginning they draw a distinction between allowing reimbursement on a "reasonable cost-related basis" and "simply requiring payment of the provider's costs." *See American Medical Ass'n v. Mathews*, 429 F.Supp. 1179, 1195–96 (N.D.Ill.1977) ("the reasonable cost standard ... most clearly embodies the Congressional formula for preventing reimbursement for excessively priced medical items and services."); *Westhampton Nursing Home v. Whalen*, 67 A.D.2d 1017, 413 N.Y.S.2d 244, 248 (1979) (interpreting N.Y.Pub. Health Law § 2808(1) [a]).

The "reasonable cost" test, whether the claimed item is "allowable, necessary, and proper," applies to every case, "subject to principles relating to specific items of revenue and cost." § 1010. Specifically governing interest expense are §§ 3030–3035.[4]

---

. **3.** 1010 *Principle.* Federal law requires that payment for long term facility services provided under Medicaid shall be provided on a "reasonable cost-related basis" rather than simply requiring payment of the provider's costs. In determining what is a reasonable cost-related basis, all payments to providers of service must be based on the "Reasonable Cost" of services covered under the program for the care of recipients. Reasonable cost includes all allowable necessary and proper costs incurred in rendering the services, subject to principles relating to specific items of revenue and cost.

1011 Costs must be ordinary and necessary and related to patient care. They must be of the nature and magnitude prudent and cost conscious management would pay for a specific item or service.

1012 Costs must not be of the type conceived for the purpose of circumventing the regulations. Such costs will be disallowed under the principle that the substance of any transaction will prevail over form.

1013 Costs that relate to inefficiency, unnecessary or luxurious care of facilities, and to activities not common and accepted in the nursing home field are not allowable.

[...]

1020 Definitions.

1021 *Reasonable Costs* are those costs incurred by a provider which are reasonable and necessary in providing adequate care to publicly-aided patients and which are within requirements and limitations of these Principles of Reimbursement. The reasonableness and necessity of any costs shall be determined by reference to or in comparison with the cost of providing comparable services and by reference to the Maine Medicaid Assistance Manual.

1022 *Allowable Costs* are the operating costs after the adjustments required by the Principles have been applied to the provider's total operating costs as reported in the annual cost reports.

1023 *Necessary and Proper Costs* are those which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity.

**4.** 3030 *Interest Expense.*

3031 *Principle.* Necessary and proper interest on both current and capital indebtedness is an allowable cost.

3032 *Definitions.*

3032.1 *Interest.* Interest is the cost incurred for the use of borrowed funds. Interest on current indebtedness is the cost incurred for funds borrowed for a relatively short term. This is usually for such purposes as working capital for normal operating expenses. Interest on capital indebtedness is the cost incurred for funds borrowed for capital purposes, such as acquisition of facilities and equipment, and capital improvements. Generally, loans for capital purposes are long-term loans.

3032.2 *Necessary.* Necessary requires that the interest:

3032.21 Be incurred on a loan made to satisfy a financial need of the provider. Loans which result in excess funds or investments would not be considered necessary.

3032.22 Be reduced by investment income except where such income is from gifts and grants, whether restricted or unrestricted, and

To be allowable interest must be "necessary and proper."[5] That Sebasticook's interest rate was "necessary," as defined in § 3032.2, is not questioned. However, the Department determined that the interest was not "proper," having been incurred at a rate "in excess of what a prudent borrower would have had to pay in the money market existing at the time the loan was made." § 3032.31.

The Department relied on the interrelationship between the principles to reach this conclusion. The "prudent borrower" standard is to be determined by reference to the other principles. Sections 1011 and 1013 dictate a comparison of the provider with an objective standard: costs "must be of the nature and magnitude that prudent and cost-conscious management would pay for a specific item or service," and not "relate to inefficiency, unnecessary or luxurious care of[6] facilities...." Sections 1021 and 1023, which define terms used in Sections 1010 to 1016, make clear that the objective standard is to be drawn from contemporary nursing home management. "The reasonableness and necessity of any costs shall be determined by reference to or in comparison with the cost of providing comparable services." § 1021. "Neces-

which are held separate and not commingled with other funds. Income from funded depreciation is not used to reduce interest expense.

3032.3 *Proper.* Proper requires that interest:

3032.31 Be incurred at a rate not in excess of what a prudent borrower would have had to pay in the money market existing at the time the loan was made.

3032.32 Be paid to a lender not related through control or ownership, or personal relationship to the borrowing organization.

3033 *Borrower-lender relationship.*

3033.1 To be allowable, interest expense must be incurred or indebtedness established with lenders or lending organizations not related through control, ownership, or personal relationship to the borrower. Presence of any of these factors could affect the "Bargaining" process that usually accompanies the making of a loan, and could thus be suggestive of an agreement on higher rates of interest or of unnecessary loans. Loans should be made under terms and conditions that a prudent borrower would make in arm's-length transactions with lending institutions. The intent of this provision is to assure that loans are legitimate and needed, that the interest rate is reasonable. Thus, interest paid by the provider to partners, stockholders, or related organizations of the provider would not be allowable. However, interest on second mortgages held by stockholders, owners, relatives or related organizations of the provider will be treated as an allowable cost if in line with the interest rates charged by lending institutions at the inception of the loan. Where the owner uses his own funds in a business, it is reasonable to treat the funds as invested funds or capital, rather than borrowed funds. Therefore, where interest on loans by partners, stockholders, or related organizations is disallowed as a cost solely because of the relationship factor, the principal of such loans shall be treated as invested funds in the computation of the provider's equity capital.

3033.2 Exceptions to the general rule regarding interest loans from controlled sources of funds are made in the following circumstances. Where the general fund of a provider borrows from a donor-restricted fund and pays interest to the restricted fund, this interest expense is an allowable cost. The same treatment is accorded interest paid by the general fund on money borrowed from the funded depreciation account of the provider. In addition, if a provider of a facility operated by members of a religious order borrows from the order, interest paid to the order is an allowable cost.

3033.3 Where funded depreciation is used for purposes other than improvement, replacement, or expansion of facilities or equipment related to patient care, allowable interest expense is reduced to adjust for offsets not made in prior years for earnings on funded depreciation.

3034 *Loans not reasonably related to patient care.* Loans made to finance that portion of the cost of acquisition of a facility that exceeds historical cost, are not considered to be for a purpose reasonably related to patient care.

3035 *Interest expense of related organizations.* Where a provider leases facilities from a related organization and the rental expense paid to the related organization is not allowable as a cost, costs of ownership of the leased facility are allowable costs of the provider. Therefore, in such cases, mortgage interest paid by the related organization is allowable as an interest cost to the provider.

5. C.F.R. § 405.419 contains the identical language.

6. Sic. Possibly should be "or."

sary and proper costs are those which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity." § 1023.

■ Far from being merely hortatory, as Sebasticook argues, these principles express the factors that comprise the "prudent borrower" standard applicable to allowable interest costs. Read together, they allow reimbursement of interest incurred at a rate that a prudent borrower, defined as prudent and cost-conscious management in comparison with the nursing home industry, would pay in the market available to the industry. So construed, it is apparent that the situation of the individual borrower does not, by itself, make allowable its interest costs. Because the interest rate incurred by any individual provider will reflect its particular circumstances, the "prudent borrower" standard would be unworkable as a cost-control method unless it was defined by reference to an external standard, in this case the industry.

Such an industry-wide standard is not peculiar to Maine's Medicaid program. A federal district court explained the rationale behind Pennsylvania's method of reimbursing daily patient care expenses in this way.

> Medicaid reimbursement rates need not meet the costs an institution actually incurs in treating medicaid patients. The states are authorized to reimburse only reasonable costs. Economic incentives are preserved in one form: Setting payment rates, measured by the operational costs of an efficient institution, on a class basis, means that efficiently operated facilities, which provide services at less than the class rate, will be able to earn a profit equal to the difference between the applicable rate and its actual cost to the efficient provider.

*DeGregorio v. Bannon,* 500 F.Supp. 541, 547–48 (E.D.Pa.1980).

Sebasticook, however, urges a narrower reading of the principles. It puts primary emphasis on §§ 3032.32 and 3033.1, the related party provisions. Its position, derived from the first sentence of § 3033.1, is that any interest rate obtained in an arm's-length transaction on the open market is *per se* allowable. Sebasticook would limit the "proper" standard of § 3032.31 to application in the situation where the loan was not at arm's-length: a subsidiary test to determine the allowability of a related-party loan. It thus argues that the Department made an error of law in applying §§ 1010–1023 and 3032.31 when Sebasticook had clearly satisfied §§ 3032.32 and 3033.1.

■ The Department, correctly we hold, interprets §§ 3032.32 and 3033.1 as prophylactic measures to ensure that insider profits are not subsidized by the public. *See University of Cincinnati, d/b/a Cincinnati General Hospital v. Heckler,* 733 F.2d 1171, 1174, CCH Medicare & Medicaid Guide, ¶ 33, 969 (6th Cir.1984); *Shaker Medical Ctr. Hospital v. Secretary of Health & Human Services,* 686 F.2d 1203, 1209 (6th Cir.1982); *Trull Nursing Home, Inc.,* 461 A.2d at 496. They act as an initial screen, through which all loans must pass, but not as the sole criteria for allowability. As stated in the Medicare Provider Reimbursement Manual, the related party proscription is "in addition to" the "proper" requirement. § 202.3, CCH Medicare & Medicaid Guide, ¶ 4927. Notably, the Sixth Circuit has analyzed 42 C.F.R. § 405.419(c) (the federal equivalent of, and literally similar to, the first sentence of § 3033.1 of the State principles) as an exception to "the *general rule* of reimbursement of the reasonable cost of services." *University of Cincinnati, d/b/a Cincinnati General Hospital,* 733 F.2d at 1174, CCH Medicare & Medicaid Guide, ¶ 33, 969 at p. 9333. (emphasis added)

None of the federal cases Sebasticook cites makes interest expense allowable solely because it was incurred in an arm's-length transaction. Rather, each considers

an aspect of the issue whether the expense is properly disallowed in full when derived from a related party transaction. *University of Cincinnati, d/b/a Cincinnati General Hospital,* 733 F.2d 1171; *Northwest Hospital, Inc. v. Hospital Service Corp.,* 687 F.2d 985 (7th Cir.1982). *Accord Fishkill Health Related Facility v. Whalen,* 95 A.D.2d 974, 464 N.Y.S.2d 580, CCH Medicare & Medicaid Guide, ¶ 32, 972 (1983) (also cited by Sebasticook, but also addressing the total disallowance of related-party interest, not the allowance of improper arm's-length interest.)

■ As the Department's Hearing Officer concluded, Sebasticook's position would require the Department to reimburse as "reasonable" *any* rate obtained at arm's-length from a commercial bank, no matter how high. The Department's interpretation of the principles does not permit that. Because the Medicaid program calls upon the public to subsidize the reasonable medical care of eligible recipients, not the complete expenses of all providers, the Department's interpretation is reasonable and appropriate. As the Hearing Officer observed, "the prudent borrower principle does not guarantee that a developer with unique borrowing problems will be relieved of the business risks associated with those problems." *E.g. Briarcliff Haven, Inc. v. Dept. of Human Res. of Georgia,* 403 F.Supp. 1355, 1363 (N.D.Ga.1975).

■ Did the Department properly apply the principles to Sebasticook? The Department did not tell Dr. Ford in 1977 that a variable rate was *per se* unreasonable. Quite probably it would not have balked at reimbursing Sebasticook's interest costs if a lower prime rate had generated actual costs at or below the "point of unreasonableness." However, the Department clearly did warn Dr. Ford that, because of the novelty of the loan in comparison with financing used by the industry generally, the risk of higher interest rates under this loan was to be borne by Sebasticook. Commissioner Smith's letter of December 21, 1977 said, after drawing a comparison with the industry,

> We will be unable to issue a letter to the Farmers' Home Administration stating that we would accept and pay for the interest as you have presented it to us in your letter .... [A]ny portion of the interest charged to your facility that reached the point of unreasonableness in comparison with other mortgage loans, would not be accepted as an allowable cost.

As the Hearing Officer found, it was .imprudent for Dr. Ford, after receiving this letter, to accept a variable rate *with the expectation that the Department would reimburse the costs in full,* no matter what happened.

■ "Congress intended that state authorities in developing methodologies for reasonable cost related reimbursement have great flexibility in the areas of cost-finding and rate-setting .... Congress intended that states have freedom both to define allowable cost items and to set a value on the reasonable cost of those items ...." *Alabama Nursing Home Ass'n v. Harris,* 617 F.2d 388, 392 (5th Cir.1980). *Accord, e.g., American Medical Ass'n v. Mathews,* 429 F.Supp. at 1195.

■ The Department fixed the "point of unreasonableness" by reference to the rest of the industry, as its interpretation of principles 1013, 1021, and 1023 required. Its finding that prudent and cost-conscious nursing home management in general would not have paid more than 11½% interest is supported by the evidence in the record. Also supported in the record is its finding that Sebasticook was not shown to have been excluded from the portion of the money market in which other nursing homes obtained fixed rate loans at lower rates during the relevant period. We note, however, that even if Sebasticook had proved conclusively that it was unable to obtain lower rates, the Department would not have been *required* to pay its total costs. The public is only required to reim-

burse a provider for what is reasonable in objective comparison with the industry.

■ Certainly we cannot expect Dr. Ford to have possessed a crystal ball with which to forecast the heights to which the prime rate would climb during 1979. Viewed from his perspective in January, 1978 a variable rate loan may not have been unreasonable. But he had been warned that reasonableness was to be assessed according to the Principles of Reimbursement, that is, from the perspective of the. whole industry. It may not be imprudent for a provider to incur abnormally high interest because of reasonable but unavoidable factors, the risk of which is properly on the public. When, on the other hand, a novel method, the risk of which the Department makes clear from the start is on the provider, causes the excess costs, the Department is justified in disallowing that excess.

■ In this case the Department was not in error in denying reimbursement in full. As we said in *Trull Nursing Home, Inc.*, where there are several rational methods for applying the principles to the facts and where the method chosen by the Department is consistent with the purpose of the Medicaid regulations and not clearly inferior to the other methods, the Department's action is not unreasonable. 461 A.2d 498–99.

## III

### Reimbursement of Accounting Fees

#### A. Background

Among the expenses the Department reimburses is compensation for the management and staff of a provider. The staff compensation is reimbursed in the full amount expended (assuming, of course, that it is reasonable and for necessary services. § 1014.) The management is reimbursed through the "administration and management allowance." § 4110. Instead of being based on actual salaries, this allowance is derived from a per-bed formula not relevant here. § 4112.1. For the year 1979, the Department reimbursed Sebasticook $24,913.55 for administrative staff compensation. It also paid an administration allowance of, apparently, $23,325. It disallowed reimbursement, however, of $4,500 out of $10,810 that Sebasticook had paid to a private accounting firm, and for which it sought reimbursement separately from the compensation and administration items.

The Hearing Officer found that the accounting fees were incurred for a variety of tasks the private firm performed for Sebasticook during 1979. Those for which the Department challenged reimbursement were the "reconstruction" of the facility's books that Sebasticook's initial bookkeepers had been unable properly to maintain, the supervision of the succession of replacement bookkeepers as they learned their jobs, and the preparation of an audited financial statement required by the Oxford Bank and of Sebasticook's tax returns. Those tasks for which reimbursement was allowed included the preparation of cost reports and other financial statements required by the Department.

On the basis of a preliminary survey of the industry that showed that Sebasticook's accounting costs per bed were significantly higher than those incurred by any other provider (the next highest was Dr. Ford's other facility, the Andrews Nursing Home), the Division of Audits disallowed reimbursement of $4,500. Sebasticook sought agency review of the action. The Hearing Officer upheld the disallowance, determining that the portion of the accounting fees attributable to non-reimbursable items in fact exceeded $4,500. His decision, which is the Department's final decision, relies not on the industry comparison, but on the specific principles applicable to administrative expenses. Sebasticook now appeals from the Superior Court judgment affirming the Department's decision.

## B. The Principles of Reimbursement

While the general principles discussed in the interest cost context also apply to the accounting fees question, the specific, detailed principles for administrative expenses provide most of the support for the Department's decision. They are found at §§ 4110–4120. Of these, §§ 4111 and 4112.2 are relevant here.[7] The rule is that, with one exception, all administrative compensation and all consulting fees are covered by the administration allowance and are not reimbursable separately. § 4111. The exception is the cost of preparing financial reports required by the Department.

■ The Hearing Officer's factual findings as to the services performed by the accounting firm are fully supported in the record. He properly concluded that, while the principles recognize supervision of the bookkeepers as a necessary cost, it is one of the administration functions listed in § 4112.23, and is thus not reimbursable separately from the administration allowance.

The salaries of the bookkeepers were reimbursed to Sebasticook as part of the $24,913.55 for administrative staff compensation. With that the Department paid the cost of keeping Sebasticook's books. When Sebasticook claimed the cost of the accountants' reconstruction of the books, it was asking Medicaid to pay for the same task twice. The Hearing Officer was correct to deny that reimbursement as a "cost relating to inefficiency." § 1013. Though the Hearing Officer did not separate the various costs from the total claimed, he would have been justified in finding from the accounting firm's own breakdown in the evidence that the fee for supervision and reconstruction was $2,647.50.

■ The Hearing Officer also found that the accountants prepared an audited financial statement for the Oxford Bank. That audited statement was required by the loan agreement. As witnesses for the Department and Sebasticook testified, it was not required by the Department. The Department only requires the simpler cost reports (§ 2010) and that the provider maintain its books in "auditable form." (§ 2051). The Hearing Officer was thus correct in finding that this item did not fall within the exception in Principle 4111 that allows reimbursement separate from the

7. 4110 *Administration and Management Allowance.*
 4111 *Principle.* An administration and policy-planning allowance shall be allowed in lieu of all compensation for the administration and policy-planning functions and in lieu of all fees for management or financial consultants. Reasonable costs associated with preparation of financial reports required by the Department are not included in the allowance. The allowance shall also be in lieu of any compensation for any other services such as nursing, cooking, bookkeeping, and the like, which are performed by the administrator who is listed on the license to operate the facility. If any owner, (other than the administrator) provides other than administration and policy-planning services to the provider, the compensation for such services shall be allowed only after advance written approval has been given by the Department.
 4112 *Definitions*

 4112.2 *Administration Functions.* The administration function includes those duties which are necessary to the general supervision and direction of the current operations of the facility, including, but not limited to the following:
 4112.21 Hiring and firing of personnel.
 4112.22 Administrative supervision of the nursing, dietary, and other personnel.
 4112.23 Supervising the maintenance of patient records and other personnel, payroll, bookkeeping, etc., records of business.
 4112.24 Supervising the maintenance and repairs of the facility.
 4112.25 Procuring necessary supplies and equipment.
 Administrators, assistant administrators, business managers, controllers, office managers, personnel directors, and purchasing agents, personal secretaries to any of the above, typify those who are included in the administration function category. Bookkeepers, secretaries, clerks, telephone operators, etc., are *not* included in this category.
 This allowance is not to include Directors of Nursing, Dietary Supervisors, or other department heads, whose prime duties are not of an administrative nature, that may be responsible for hiring or purchasing for their Department.

administration allowance for financial reports required by the Department. From the accounting firm's report it appears that this item amounted to $2,500.

 Finally, Sebasticook claimed reimbursement for the fees it paid the accountants to prepare its tax returns. Although necessary, this item is covered by the inclusion in the administrative allowance of all fees for financial consultants. Because the accountants' breakdown lumps this item together with a reimbursable item, there is no clear indication of how much of Sebasticook's claim relates to the tax returns. No matter what their cost, however, substantial evidence in the record supports the Department's decision that it properly disallowed at least $4,500 of Sebasticook's claim.

 As with the interest cost issue, Sebasticook takes the position that its expenses are reimbursable in full simply because they were incurred to meet actual conditions encountered in operation. It misconceives the nature of the public funding of medical services. The public is entitled to expect that it will pay no more than a reasonable amount for the services its eligible members receive. It is entitled to expect that those claiming public funds to provide services will claim only the reasonable costs of those services. In this case the Department of Human Services has properly promulgated guidelines for reimbursement. It denies part of the reimbursement claimed for unusually high costs based on a reasonable interpretation of those guidelines. The net result is compatible with the fiscally-responsible "reasonable cost-related" reimbursement policy of the Social Security Act. Sebasticook has not met its burden of showing that the Department's decision was arbitrary or unlawful.

The entry is:

Judgment affirmed.

All concurring.